# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

ROUCH WORLD, LLC v DEPARTMENT OF CIVIL RIGHTS

Docket No. 162482. Argued March 2, 2022. Decided July 28, 2022.

Rouch World, LLC, and Uprooted Electrolysis, LLC, brought an action in the Court of Claims against the Department of Civil Rights and its director, seeking, among other relief, a declaratory judgment that the prohibition of sex discrimination in places of public accommodation under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, did not bar discrimination based on sexual orientation or gender identity. The owners of Rouch World had denied a request to host the same-sex wedding of Natalie Johnson and Megan Oswalt at their facility, claiming that doing so would violate their religious beliefs. The owner of Uprooted Electrolysis had denied hair-removal services to Marissa Wolfe, a transgender woman, on the same basis. Johnson, Oswald, and Wolfe filed complaints with the Department of Civil Rights, which had issued an interpretive statement in 2018 indicating that the ELCRA's prohibition against discrimination based on sex included sexual orientation and gender identity. The Department of Civil Rights opened an investigation into both of these incidents, but the investigations were stayed when plaintiffs brought this action. Defendants moved for summary disposition under MCR 2.116(C)(8). The Court of Claims, CHRISTOPHER M. MURRAY, J., concluded that it was bound to follow *Barbour v Dep't of Social Servs*, 198 Mich App 183 (1993), which had relied largely on then-current federal precedent regarding analogous provisions of Title VII of the Civil Rights Act, 42 USC 2000e *et seq.*, to conclude that the ELCRA's discrimination prohibition did not encompass sexual orientation. The Court of Claims therefore denied defendants' motion for summary disposition as applied to plaintiff Rouch World's arguments. However, because *Barbour* did not concern gender-identity discrimination, the Court of Claims ruled that when a person discriminates against someone who identifies with a gender different than that assigned at birth, then that is dissimilar treatment on the basis of sex and is prohibited under the ELCRA. In so concluding, the Court of Claims relied, in part, on the United States Supreme Court decision in *Bostock v Clayton Co*, 590 US ___, ___; 140 S Ct 1731 (2020), wherein the Court held that an employer violates Title VII when it intentionally fires a person on the basis of their homosexuality or transgender identity because doing so necessarily involves discrimination based on sex. Accordingly, the Court of Claims granted defendants' motion for summary disposition as to plaintiff Uprooted Electrolysis's arguments. Defendants filed an interlocutory application for leave to appeal in the Court of Appeals, challenging the rejection of summary disposition as to Rouch World. Defendants then filed a bypass application in the Supreme Court, which granted the application to

address "whether the prohibition on discrimination 'because of . . . sex' in the [ELCRA] applies to discrimination based on sexual orientation." 507 Mich 999 (2021).

In an opinion by Justice CLEMENT, joined by Chief Justice MCCORMACK and Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court *held*:

Discrimination on the basis of sexual orientation necessarily constitutes discrimination because of sex. Accordingly, the denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service" on the basis of sexual orientation constitutes discrimination "because of . . . sex" and, therefore, constitutes a violation of the ELCRA under MCL 37.2302(a). The Court of Appeals' decision in *Barbour* was overruled, and the Court of Claims' decision with respect to Rouch World was reversed.

1. The ELCRA provides in MCL 37.2302(a) that except where permitted by law, a person shall not deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. In *Barbour*, the Court of Appeals held that the ELCRA did not encompass sexual-orientation discrimination, and it based this decision on federal cases holding, with regard to Title VII, that Congress's intent in prohibiting discrimination because of sex was to place women on an equal footing with men rather than to regulate discrimination based on sexual orientation. Since the Court of Appeals decision in *Barbour*, the cases on which that Court relied were overturned in *Bostock*, 590 US ___; 140 S Ct 1731. In *Bostock*, the United States Supreme Court considered whether discrimination based on sexual orientation or gender identity was encompassed by Title VII's prohibition of employee discharge because of sex. The Court proceeded on the assumption that "sex" referred only to biological distinctions between male and female. Next, the Court noted that it had previously defined "because of" as meaning "by reason of" or "on account of," which established a but-for standard of causation. The Court specifically eschewed a definition of discrimination that would require an analysis comparing the employer's differential treatment of employees grouped by protected characteristic rather than individual employees themselves, concluding that the relevant inquiry under Title VII was whether the specific employee was treated differently, not whether the employer treats different groups of persons differently. From these textual assessments, the Court deduced that an employer violates Title VII when it intentionally fires an individual employee based in part on sex. Applying this principle to discrimination on the basis of sexual orientation and gender identity, the Court concluded that it would be impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex—in other words, the Court held that discrimination based on sexual orientation or gender identity is necessarily encompassed within discrimination because of sex.

2. The Michigan Supreme Court has previously held that the operative phrase "because of" in the ELCRA establishes a but-for causation standard. Under this standard, causation is satisfied where sex is a determining factor in the discriminatory action; in other words, causation is established where the discriminatory action would not have occurred but for the sex of the complainant. Accordingly, the question in this case was whether complainants who were denied service because of their sexual orientation would not have been so denied but for their sex. Like

its federal counterpart, the ELCRA does not define the term "sex." However, regardless of whether one defines "sex" expansively or narrowly, the result of the textual analysis is the same: discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of the ELCRA, for the persuasive reasons articulated in *Bostock*.

3. Rouch World denied Johnson's request for services related to her wedding with Oswalt. Had Johnson been a man, Rouch World would not have denied its services. In other words, but for Johnson's sex, Rouch World would have rendered its services to Johnson. Although Rouch World's motivation for its denial of services was based on Johnson's sexual orientation, it was nevertheless true that, holding all other facts constant (including the sex of the romantic partner involved), Rouch World discriminated against Johnson because of her sex. Because one's sex is necessary to the identification of sexual orientation, discrimination on that basis is discrimination on the basis of sex. Incorporating an additional consideration—such as the sexual preference of that individual—and retitling that pair of considerations does not remove the effect of sex from the equation. Contrary to the argument put forward by Rouch World, the ELCRA's prohibition of sex discrimination requires a determination whether a specific individual was treated worse than a member of the opposite sex would have been; it does not ask how one sex-based group is treated as compared to another sex-based group. Further, evidence that the 1976 Legislature that enacted the ELCRA intentionally chose to exclude protections from discrimination based on sexual orientation, both at the time of its enactment by declining to include the specific language and repeatedly thereafter, would have been relevant only if the statute were ambiguous. When a statute's language is clear, as it was here, its plain language is the best evidence of its meaning. While the principal evil motivating the 1976 Legislature to prohibit discrimination on the basis of sex may have been the preferential treatment of males to the detriment of females, this motivation does not curtail other applications of the plain statutory language. Both the ELCRA and Title VII have been applied to circumstances likely unanticipated by the enacting Legislature, including pregnancy discrimination, sex-stereotyping cases, same-sex sexual harassment, and retirement accounts. The Legislature's failure to foresee particular statutory applications does not prohibit these applications as long as they are consistent with the plain language of the statute.

Reversed in part and remanded for further proceedings.

Justice ZAHRA, dissenting, took no issue with the merits of the policy adopted by the majority, but stated that under the Michigan Constitution and its separation of powers, it is the ultimate responsibility of the Legislature or the people to write, amend, or repeal the laws, while the Supreme Court's duty is to say what the law is rather than what it ought to be. He stated that the majority's conclusion that the ELCRA prohibits discrimination based on sexual orientation construed "because of . . . sex" to mean something that nobody in 1976 thought it meant, according to lay dictionaries and linguistic evidence of the period, and he noted that none of the entities charged with enforcing the ELCRA understood it to prohibit sexual-orientation discrimination until 2018. The fact that the Legislature specifically and explicitly considered adding sexual orientation to the ELCRA but ultimately chose not to do so materially distinguished this case from *Bostock*, thereby requiring a different outcome. Justice ZAHRA concluded that the ELCRA's use of "sex" refers to whether one is a biological male or a biological female and that defendants did not prevail under that narrower definition. For these reasons, he would have affirmed the Court of Claims' conclusion that sexual orientation is not a protected class under the ELCRA.

Justice Viviano, dissenting, agreed with Justice Zahra's conclusion.  He wrote separately to state that the majority altered the meaning of the ELCRA by adopting the logic of the but-for test without the need for a defendant to have any discriminatory intent, which did not reflect the ordinary meaning of the statute or the inherently intentional nature of discrimination.  He noted that the results would be significant for Michigan, given that the scope of the ELCRA extends beyond the statute at issue in *Bostock* because it covers all employers.  Further, it does not appear that the ELCRA contains exemptions for religious organizations similar to those in the statute at issue in *Bostock* or that other statutes offer protections for religious liberty that supersede the ELCRA's requirements.  The majority's failure to consider whether its interpretation of the ELCRA violated constitutional protections of religious liberty departed from the principle that courts will first consider whether an interpretation raises grave constitutional doubts before adopting that interpretation, and given that various amici argued that the majority's interpretation would trench on constitutional liberties, the majority should have considered those concerns.  Justice Viviano would have held that MCL 37.2302(a) does not prohibit discrimination because of sexual orientation and that the ELCRA applies only if a defendant took a prohibited action as a result of a prejudice, bias, animus, or belief with regard to a particular protected characteristic.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 28, 2022

STATE OF MICHIGAN

SUPREME COURT

ROUCH WORLD, LLC, and UPROOTED
ELECTROLYSIS, LLC,

Plaintiffs-Appellees,

v                                                                No. 162482

DEPARTMENT OF CIVIL RIGHTS and
DIRECTOR OF THE DEPARTMENT OF
CIVIL RIGHTS,

Defendants-Appellants.

BEFORE THE ENTIRE BENCH

CLEMENT, J.

At issue for our consideration is whether the prohibition of discrimination "because of . . . sex" in the Elliott-Larsen Civil Rights Act (the ELCRA), MCL 37.2101 *et seq*., encompasses discrimination on the basis of sexual orientation. We hold that it does. Accordingly, we overrule the Court of Appeals decision in *Barbour v Dep't of Social Servs*,

198 Mich App 183, 185; 497 NW2d 216 (1993), and reverse in part the Court of Claims decision below.

## I. LEGAL BACKGROUND

This case concerns acts of alleged discrimination investigated by defendant, the Michigan Department of Civil Rights (the MDCR). The MDCR is an administrative agency that serves as the operational arm of the Michigan Civil Rights Commission (the MCRC). See MCL 16.575 through MCL 16.577. The MCRC is a constitutional body whose purpose is to secure constitutional and statutory guarantees against discrimination and investigate allegations that those guarantees have been violated. Const 1963, art 5, § 29.

Among the legal guarantees against discrimination enforced by the MCRC is the statutory guarantee against discrimination provided by the ELCRA. The ELCRA recognizes as a civil right "[t]he opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status . . . ." MCL 37.2102(1). Through the recognition and protection of this civil right, the ELCRA seeks to dismantle "the prejudices and biases borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Miller v C A Muer Corp*, 420 Mich 355, 363; 362 NW2d 650 (1984) (quotation marks and citations omitted).

The ELCRA specifically protects against discrimination in public accommodations[1] as follows:

> Except where permitted by law, a person shall not:
>
> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302.]

Pursuant to its role in enforcing the ELCRA, the MCRC in May 2018 offered to the public for guidance its nonbinding interpretation of the practices prohibited by this statutory provision.[2] Specifically, Interpretive Statement 2018-1 opines that the prohibition of discrimination in places of public accommodation "because of . . . sex" in MCL 37.2302(a) includes a prohibition of discrimination on the basis of sexual orientation and gender identity. The MCRC reasoned "that continuing to interpret the protections

_____

[1] MCL 37.2301(a) defines a "place of public accommodation" as

> a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

[2] Interpretive statements issued by the MCRC do not have the force of law. MCL 24.207(h); *Mich Farm Bureau v Bureau of Workmen's Compensation*, 408 Mich 141, 149-150; 289 NW2d 699 (1980). Sometimes referred to as "interpretive rules," these "are statements as to what the agency thinks a statute or regulation means; they are statements issued to *advise* the public of the agency's construction of the law it administers." *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 243-244; 501 NW2d 88 (1993) (quotation marks and citation omitted). "The 'pragmatic consequences' of interpretive 'rules' is that they are published as 'declaration[s] of the proper interpretation of the law, and those affected will normally conform, since the regulation provides a practical guide as to how the office representing the public interest in enforcing the law will apply it.' " *Id*. at 244, quoting Schwartz, Administrative Law (2d ed), § 4.6, pp 159-160.

afforded by the phrase 'discrimination because of . . . sex' more restrictively by continuing to exclude individuals for reasons of their gender identity or sexual orientation, would itself be discriminatory."[3]  Pursuant to this interpretation of MCL 37.2302(a), the MCRC through the MDCR has since investigated complaints alleging discrimination on account of gender identity and sexual orientation.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

This case involves two acts of alleged sex-based discrimination investigated by the MDCR pursuant to Interpretive Statement 2018-1.  The first involves plaintiff Rouch World, LLC, which operates an event center in Sturgis, Michigan.  In April 2019, Natalie Johnson and Megan Oswalt approached Rouch World regarding hosting their same-sex wedding at its facility.  Rouch World declined.  Its owners, Ben and Jamey Rouch, explained that hosting and participating in a same-sex wedding ceremony would violate their sincerely held religious belief that marriage is a sacred act of worship between one man and one woman.  Johnson and Oswalt thereafter filed complaints with the MDCR, wherein they alleged that Rouch World discriminated against them on the basis of sex in violation of the ELCRA.

The second alleged act of sex-based discrimination occurred when plaintiff Uprooted Electrolysis, LLC, denied hair-removal services to Marissa Wolfe, a transgender woman.  Sheri Curtice-Young, the owner of Uprooted Electrolysis, perceived the requested

---

[3] Interpretive Statement 2018-1, p 1, available at <https://www.michigan.gov/-/media/Project/Websites/mdcr/mcrc/interpretive-statements/2018/meaning-of-sex.pdf?rev=c5ef0e9276a44504b857435423cb887c> (accessed June 23, 2022) [https://perma.cc/RX8Y-D2K8].

4

services to be centrally connected to Wolfe's transgender identity and asserted that delivering these services would violate her sincerely held religious belief that sex is an immutable gift from God. Wolfe thereafter filed a complaint with the MDCR alleging that Uprooted Electrolysis had discriminated against her on the basis of sex in violation of the ELCRA.

Pursuant to the MCRC's Interpretive Statement 2018-1, the MDCR opened investigations into both of these incidents. But the investigations were stayed when plaintiffs jointly sued the MDCR and its then director, seeking declaratory and injunctive relief. Specifically, plaintiffs sought a declaratory judgment that sexual orientation and gender identity are not encompassed by the ELCRA's prohibition of sex discrimination in places of public accommodation and an injunction prohibiting the continued investigation of the complaints filed against plaintiffs and the MDCR's continued adherence to Interpretive Statement 2018-1.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(8)[4] regarding the interpretation of the ELCRA, and the Court of Claims denied the motion in part and granted it in part. Regarding whether sexual orientation is encompassed by the ELCRA, the Court of Claims determined that it was bound to follow the Court of Appeals decision in *Barbour*, 198 Mich App 183. In *Barbour*, relying largely on then-current federal precedent regarding analogous provisions of Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq*., the Court of Appeals concluded that the ELCRA's

---

[4] MCR 2.116(C)(8) provides that a trial court may grant relief to a moving party where "[t]he opposing party has failed to state a claim on which relief can be granted."

5

discrimination prohibition did not encompass sexual orientation.  *Id*. at 185. Acknowledging itself bound by this determination from *Barbour*, the Court of Claims here denied defendants' motion for summary disposition as applied to plaintiff Rouch World's arguments.

However, because *Barbour* did not concern gender-identity discrimination, the Court of Claims determined that it was not bound by *Barbour* in regard to plaintiff Uprooted Electrolysis's arguments.  The Court of Claims considered the issue and determined that when a person discriminates against "someone who 'identifies' with a gender different than the gender that he or she was born as, then that is dissimilar treatment on the basis of sex" as prohibited under the ELCRA.  In so concluding, the Court of Claims relied in part on the recent United States Supreme Court decision in *Bostock v Clayton Co*, 590 US ___, ___; 140 S Ct 1731, 1741; 207 L Ed 2d 218 (2020), wherein the Court held that an employer violates Title VII when it intentionally fires a person on the basis of their homosexuality or transgender identity because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  Accordingly, the Court of Claims granted defendants' motion for summary disposition as to plaintiff Uprooted Electrolysis's arguments.

Defendants subsequently filed an interlocutory application for leave to appeal in the Court of Appeals, challenging the rejection of summary disposition as to plaintiff Rouch World's sexual-orientation arguments.  Shortly thereafter, defendants filed a bypass application in this Court.  This Court granted the bypass application to address "whether the prohibition on discrimination 'because of . . . sex' in the [ELCRA] applies to discrimination based on sexual orientation."  *Rouch World, LLC v Dep't of Civil Rights*,

6

507 Mich 999, 999 (2021). Notably, plaintiffs did not cross-appeal the Court of Claims' determination that gender identity is encompassed by the ELCRA—the basis of the complaint against Uprooted Electrolysis—and so that issue is not currently before this Court.[5]

## III. ANALYSIS

We review de novo both the denial of a motion for summary disposition and questions of statutory interpretation. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999); *Eggleston v Bio-Med Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003). When interpreting a statute, this Court's "primary goal is to ascertain and give effect to the Legislature's intent." *Tomecek v Bavas*, 482 Mich 484, 495-496; 759 NW2d 178 (2008). "[T]he most reliable evidence of that intent is the plain language of the statute." *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 360-361; 917 NW2d 603 (2018). "If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we

---

[5] Whether enforcement under the ELCRA for sexual-orientation and gender-identity discrimination would violate plaintiffs' federal and state constitutional religious liberty protections has not yet been adjudicated below and, accordingly, is also not currently before this Court.

Further, this appeal arises from plaintiffs' lawsuit challenging the scope of the protected class of "sex" under the ELCRA, which was filed in response to the MDCR investigation into plaintiffs' alleged denial of a public accommodation. This is not an appeal from the currently stayed investigations of plaintiffs' conduct or any enforcement action that might result from those investigations. Accordingly, the issue before this Court also does not encompass what the MDCR must prove to demonstrate that discrimination on the basis of a protected characteristic was the cause of a denial of a public accommodation or whether the MDCR can carry this burden of proof.

enforce the statute as written." *South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518, 528; 734 NW2d 533 (2007) (quotation marks and citations omitted).  However, if the statute's language is ambiguous, this Court "may refer to the history of the legislation in order to determine the underlying intent of the Legislature." *Luttrell v Dep't of Corrections*, 421 Mich 93, 103; 365 NW2d 74 (1984).  This Court must attempt to avoid any construction that would render portions of a statute surplusage or nugatory.  *South Dearborn*, 502 Mich at 361.  Finally, in interpreting the ELCRA specifically, this Court has encouraged using as guidance federal precedent interpreting Title VII of the federal Civil Rights Act, the statute on which the ELCRA was based.[6]  See *Radtke v Everett*, 442 Mich 368, 381; 501 NW2d 155 (1993); *Rasheed v Chrysler Corp*, 445 Mich 109, 124 n 20; 517 NW2d 19 (1994) (noting that the ELCRA was "clearly modeled" after Title VII).

## A.  APPLICABLE CASELAW

Today, this Court is asked to determine whether the ELCRA's prohibition of discrimination "because of . . . sex," MCL 37.2302(a), encompasses discrimination based on sexual orientation.  As the Court of Claims recognized, the Court of Appeals previously answered this question in the negative in *Barbour*, 198 Mich App 183.  In *Barbour*, the plaintiff was subject to harassment in his workplace on the basis of his perceived sexual orientation.  *Id*. at 184.  On appeal, the Court of Appeals summarily affirmed the trial

---

[6] The two statutes share similar language.  Specifically, Title VII prohibits an employer from discriminating against an individual "because of such individual's race, color, religion, sex, or national origin[.]"  42 USC 2000e-2(a)(1).  Compare MCL 37.2302(a) (prohibiting discrimination in a place of public accommodation or public service "because of religion, race, color, national origin, age, sex, or marital status").

8

court's determination that the ELCRA did not encompass sexual-orientation discrimination on the basis of federal precedent holding the same with regard to Title VII, i.e., *DeSantis v Pacific Tel & Tel Co*, 608 F2d 327 (CA 9, 1979), overruled in part by *Nichols v Azteca Restaurant Enterprises, Inc*, 256 F3d 864 (CA 9, 2001); *Williamson v A G Edwards & Sons, Inc*, 876 F2d 69 (CA 8, 1989), overruled by *Horton v Midwest Geriatric Mgt*, 963 F3d 844 (CA 8, 2020); and *DeCintio v Westchester Co Med Ctr*, 807 F2d 304 (CA 2, 1986). *Barbour*, 198 Mich App at 185-186. In those cases, the federal circuits reasoned that Congress's intent in enacting Title VII—and specifically, its reference to "sex"—was "to place women on an equal footing with men," rather than to regulate discrimination based on sexual orientation. *DeSantis*, 608 F2d at 329 (quotation marks and citation omitted). See also *DeCintio*, 807 F2d at 306. *Barbour* adopted the conclusion of these federal circuits without engaging in its own analysis of the issue under the ELCRA.[7]

*Barbour*, as a published, post-1990 Court of Appeals opinion, has precedential effect, and the Court of Claims properly recognized below that it was bound by that decision. MCR 7.215(C)(1) and (J)(1). However, this Court is not so bound, and developments in the law since *Barbour* have called into question its validity. Specifically, since the Court of Appeals decision in *Barbour*, the cases on which that Court relied were overturned in *Bostock*, 590 US ___; 140 S Ct 1731. In *Bostock*, the United States Supreme Court considered whether the employee plaintiffs terminated for their sexual orientation or

---

[7] *Barbour* also did not consider whether a later United States Supreme Court decision— *Price Waterhouse v Hopkins*, 490 US 228; 109 S Ct 1775; 104 L Ed 2d 268 (1989) (opinion of Brennan, J.; superseded by statute on other grounds), which held that sex stereotyping falls under Title VII's prohibition of sex discrimination—undermined the analysis employed by the *DeSantis* and *DeCintio* courts.

9

gender identity brought cognizable claims of unlawful discrimination under Title VII.[8]  *Id.* at \_\_\_; 140 S Ct at 1737-1738.  Specifically at issue was whether discrimination based on sexual orientation or gender identity is encompassed by Title VII's prohibition of employee discharge "because of such individual's . . . sex." *Id.* at \_\_\_; 140 S Ct at 1738.

To begin, the majority examined three distinct portions of the statutory text at hand: the term "sex," the phrase "because of," and the provision's subsequent catchall phrase "or otherwise to discriminate."  With regard to defining the term "sex," the employers proposed a definition of "sex" as "status as either male or female [as] determined by reproductive biology," as the term allegedly would have been understood by Congress in 1964 when Title VII was enacted.  *Id.* at \_\_\_; 140 S Ct at 1739.  The employees, on the other hand, argued for a broader definition of the term "sex" that encompassed "at least some norms concerning gender identity and sexual orientation."  *Id.*  However, "[b]ecause nothing in [the majority's] approach to these cases turn[ed] on the outcome of the parties' debate, and because the employees concede[d] the point for argument's sake," the majority proceeded

---

[8] *Bostock* consolidated three separate Title VII claims.  First, Gerald Bostock, a longtime child welfare advocate for Clayton County, Georgia, was terminated for conduct unbecoming a county employee shortly after he began participating in a gay softball league and after community members made disparaging comments about his involvement in the league and his sexual orientation.  *Id.* at \_\_\_; 140 S Ct at 1737-1738.  Second, Donald Zarda, who had worked for several seasons as a skydiving instructor at Altitude Express in New York, was terminated days after mentioning that he was gay.  *Id.* at \_\_\_; 140 S Ct at 1738.  Finally, Aimee Stephens was terminated after informing her employer, R.G. & G.R. Harris Funeral Homes in Garden City, Michigan, that she intended to "live and work full-time as a woman" upon her return from an upcoming vacation.  *Id.*  Stephens had initially presented as male when she began work with Harris Funeral Homes six years earlier.  *Id.*

10

on the assumption that "sex" referred "only to biological distinctions between male and female." *Id*.

Next, the majority considered the operative phrase of the statute—"because of." The majority noted that it had previously defined this phrase as meaning "by reason of" or "on account of" and as establishing a but-for standard of causation. *Id*. (quotation marks and citation omitted). Under this standard, "causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Id*. The majority acknowledged the breadth of this standard, as multiple but-for causes may exist for any single event, but noted that Congress had chosen this specific language rather than the more limiting language it had used for causation in other statutes. *Id*. Accordingly, this chosen causation standard would prevent an employer from avoiding liability for discriminatory action by merely citing some other, nondiscriminatory factor that contributed to the employment action. *Id*.

The majority next assessed the catchall phrase "or otherwise . . . discriminate against," which appears at the conclusion of the statute's list of prohibited actions. *Id*. at ___; 140 S Ct at 1740. The employers argued that the inclusion of this phrase meant that Title VII prohibits employee discharge only when it involves both a protected characteristic and discrimination. *Id*. The majority again accepted this premise for argument's sake and went on to define "discrimination" as "treating that individual worse than others who are similarly situated." *Id*. In so doing, the majority specifically eschewed a definition of discrimination that would require a group-focused analysis that compares the employer's differential treatment of employees grouped by protected characteristic rather than individual employees themselves. *Id*. The eschewed perspective was seen as inconsistent

11

with Title VII's repeated references to "individuals" rather than groups—i.e., " 'discharge any *individual*,' " " 'otherwise . . . discriminate against any *individual*,' " and " 'because of such *individual*'s' " protected characteristic. *Id*., quoting 42 USC 2000e-2(a)(1) (emphasis added). Given that individual focus, the majority concluded that the relevant inquiry under Title VII is whether the specific employee was treated differently, not whether the employer treats different groups of persons differently. *Bostock*, 590 US at ___; 140 S Ct at 1740.

From these textual assessments, the majority deduced that "[a]n employer violates Title VII when it intentionally fires an individual employee based in part on sex." *Id*. at ___; 140 S Ct at 1741. Applying this principle to discrimination on the basis of sexual orientation and gender identity, the majority concluded:

> [I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex. Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as a male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision. [*Id*. at ___; 140 S Ct at 1741-1742.]

12

In sum, the majority held that discrimination based on sexual orientation or gender identity is necessarily encompassed within discrimination because of sex. See *id*.

The majority further acknowledged that when discrimination on the basis of sexual orientation is at issue, there may be two contributing factors to that discrimination: the individual's sex and the sex to which that individual is attracted. *Id*. at ___; 140 S Ct at 1742. But the fact that the individual's sex is one of the causes of the discrimination—that "but for" the individual's sex, the action would not have occurred—is sufficient to satisfy Title VII; the existence of an additional but-for cause does not eliminate liability. *Id*. Similarly, the fact that the employer may have intended to discriminate on the basis of sexual orientation but not sex does not evade liability because "an employer who discriminates on th[is] ground[] inescapably *intends* to rely on sex in its decisionmaking" because sexual orientation is "inextricably bound up with sex." *Id*. Finally, the majority also rejected the premise that an employer's willingness to discriminate against both male and female employees on the basis of sexual orientation removed Title VII liability. *Id*. Because Title VII requires an individual-based analysis rather than a group-based analysis, its liability is not limited to only employers who treat different groups of employees differently. *Id*. Accordingly, discriminating against individuals of different protected characteristic groups similarly "doubles rather than eliminates Title VII liability." *Id*. at ___; 140 S Ct at 1742-1743.

*Bostock* was not a unanimous opinion; Justices Alito, Thomas, and Kavanaugh dissented. The dissenting justices argued that the majority had usurped the authority of Congress by essentially rewriting Title VII to encompass discrimination based on sexual orientation and gender identity. *Id*. at ___; 140 S Ct at 1754-1755 (Alito, J., dissenting);

13

*id*. at ___; 140 S Ct at 1822 (Kavanaugh, J., dissenting). They reasoned that, had Congress intended for sexual orientation and gender identity to be protected by Title VII, it would have used those terms specifically when it enacted the statute. *Id*. at ___; 140 S Ct at 1829-1830 (Kavanaugh, J., dissenting). Instead, however, Congress used the term "sex," which they opined was nearly universally understood in 1964 to refer to biological or anatomical distinctions between male and female and would not have been expected to include sexual orientation or gender identity. *Id*. at ___, ___; 140 S Ct at 1767, 1772 (Alito, J., dissenting). Further, the dissenting justices noted that repeated attempts to amend Title VII to include the specific terms sexual orientation and gender identity had proved unsuccessful. *Id*. at ___; 140 S Ct at 1777-1778 (ALITO, J., dissenting); *id*. at ___; 140 S Ct at 1823-1824 (Kavanaugh, J., dissenting). Finally, the dissenting justices challenged the majority's conclusion that discrimination based on sexual orientation and gender identity necessarily entails discrimination based on sex, arguing that sex is distinct from these concepts and that employers who discriminate on the basis of sexual orientation and gender identity may not necessarily intend to discriminate on the basis of sex. *Id*. at ___; 140 S Ct at 1758-1760 (Alito, J., dissenting); *id*. at ___; 140 S Ct at 1828-1829 (Kavanagh, J., dissenting).

In response, the majority reiterated its position that although sexual orientation and gender identity are distinct concepts from sex, discrimination on the basis of the former two concepts necessarily entails discrimination on the basis of the latter. *Id*. at ___; 140 S Ct at 1747 (majority opinion). Accordingly, the majority asserted that it was not redefining "sex" to include sexual orientation and gender identity but instead finding that the concepts are inextricably linked. *Id*. That Congress may not have anticipated this exact application of Title VII's prohibition of discrimination on the basis of sex does not prevent that

14

application of unambiguous statutory text.[9] *Id*. at ___, ___; 140 S Ct at 1747, 1750-1751. Demonstrating this principle in exercise, the majority referred to its decision in *Pennsylvania Dep't of Corrections v Yeskey*, 524 US 206, 208; 118 S Ct 1952; 141 L Ed 2d 215 (1998), wherein it determined that the directive in the Americans with Disabilities Act (the ADA) that prohibits public entities from discrimination against disabled individuals applied to prisons, despite Pennsylvania's argument that Congress had not predicted that the ADA would apply to prisoners with disabilities when it enacted the ADA. *Id*. at ___; 140 S Ct at 1751. See also *id*. at ___, ___; 140 S Ct at 1747, 1752 (noting with regard to Title VII specifically that its accepted but likely unanticipated applications include sexual harassment and motherhood discrimination). The majority explained that the application of protective legislation to politically unpopular groups may not have been foreseen by the specific enacting Congress, but refusing to apply a statute on this ground "would not only require us to abandon our role as interpreters of statutes; it would tilt the scales of justice in favor of the strong or popular and neglect the promise that all persons are entitled to the benefit of the law's terms." *Id*. at ___; 140 S Ct at 1751. Further, to the extent that the dissenting justices argued that Congress's failure to enact amendments to Title VII that would specifically include sexual orientation and gender identity was probative of Congress's intent that "sex" did not include these concepts, the majority noted

---

[9] The majority also expressed skepticism regarding whether this assertion was true, noting that discrimination claims related to sexual orientation and gender identity were filed nearly immediately after Title VII's passage and that there was public discourse within 10 years of Title VII's passage regarding whether the analogous language of the proposed Equal Rights Amendment would afford protections to homosexual persons. *Id*. at ___; 140 S Ct at 1750-1751.

that "no authoritative evidence" exists explaining why Congress failed to adopt such amendments here. *Id*. at ___; 140 S Ct at 1747.[10] Without such evidence, only speculation remains, and "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Id*., quoting *Pension Benefit Guaranty Corp v LTV Corp*, 496 US 633, 650; 110 S Ct 2668; 110 L Ed 2d 579 (1990).

In sum, *Bostock* held that Title VII's prohibition of employee discharge "because of such individual's . . . sex" necessarily encompasses discriminatory employer action on the basis of sexual orientation and gender identity. In so holding, *Bostock* overruled lower federal precedent that had previously held to the contrary, including *DeSantis*, *Williamson*, and *DeCintio*—the cases on which the Michigan Court of Appeals relied in *Barbour*.

### B. ELCRA ANALYSIS

Given *Barbour*'s limited independent analysis and the overruling of the federal precedent it relied on in *Bostock*, as well as the new rule of federal law adopted in *Bostock*, we find it appropriate to now consider whether the ELCRA encompasses discrimination on the basis of sexual orientation.

---

[10] The majority provided multiple reasons why subsequent Congresses might have failed to enact such amendments:

> Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed. Maybe others knew about its impact but hoped no one else would notice. Maybe still others, occupied by other concerns, didn't consider the issue at all. [*Id*.]

16

Section 302 of the ELCRA prohibits the denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex . . . ." MCL 37.2302(a). This Court has previously held that the operative phrase "because of" in the ELCRA establishes a but-for causation standard. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016). See also *The American Heritage Dictionary of the English Language* (5th ed) (defining "because of" as "[o]n account of; by reason of"). Under this standard, causation is satisfied where sex is "a determining factor" in the discriminatory action. *Matras v Amoco Oil Co*, 424 Mich 675, 682-683; 385 NW2d 586 (1986). In other words, causation is established where the discriminatory action would not have occurred but for the sex of the complainant. See *id*. See also *Radtke*, 442 Mich at 379 ("[T]he essence of a sex discrimination civil rights suit is that similarly situated people have been treated differently because of their sex."). Accordingly, we must answer here whether complainants who were denied service because of their sexual orientation would not have been so denied but for their sex.

Like its federal counterpart, the ELCRA does not define the term "sex."[11] Drawing from contemporary and historical dictionaries, the parties and amici propose varying definitions of the term "sex" and encourage this Court to affirmatively endorse one definition or another. Plaintiff Rouch World and certain amici propose a narrower

---

[11] The ELCRA does specify that "[d]iscrimination because of sex includes sexual harassment," MCL 37.2103(i), and that the term "sex" "includes, but is not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth that does not include nontherapeutic abortion not intended to save the life of the mother," MCL 37.2201(d). But neither of these provisions offers an exclusive definition of the term "sex."

17

definition of "sex" that defines the word as "whether one is a biological male or biological female"; but defendants and other amici propose a more expansive definition that incorporates physiological, structural, and behavioral characteristics. However, like our counterparts at the United States Supreme Court, we conclude that choosing between these definitions is not necessary here because the result of our textual analysis is the same regardless of whether we adopt a narrower or more expansive definition of the term "sex." Accordingly, for the sake of argument, we use but do not affirmatively rule in favor of the more restrictive definition.

Using this more restrictive definition of the term "sex" and applying the but-for causation standard to the provision at hand, we conclude that discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of the ELCRA. In so doing, we find persuasive *Bostock*'s application of Title VII's but-for standard. While we are encouraged but not bound to consider persuasive Title VII federal caselaw, *Radtke*, 442 Mich at 381-382, we find that *Bostock* offers a straightforward analysis of the plain meaning of analogous statutory language and we agree with its reasoning.[12] A discriminator's choice to "[d]eny an individual the full and equal enjoyment

---

[12] Plaintiff Rouch World emphasizes that this Court is not bound to interpret the ELCRA in the same manner as the United States Supreme Court has interpreted Title VII, and that this Court has, in fact, previously criticized such reliance. For example, in *Haynie v Dep't of State Police*, 468 Mich 302, 320; 664 NW2d 129 (2003), this Court applied the ELCRA's prohibition of sexual harassment differently than United States Supreme Court precedent regarding the prohibition of sexual harassment under Title VII. In so doing, this Court opined that "[w]e cannot agree that any time the Michigan Legislature creates a law that is 'similar' to a federal law, it must be made identical, and the two laws must be interpreted to mean exactly the same thing." *Id*. We further recognized that "the Michigan Legislature is allowed to determine for itself the extent to which it wishes to track the language of the federal law" and that differences between the statutory language may

18

of the goods, services, facilities, privileges, advantages, or accommodations," on the basis

of that individual's sexual orientation is action that is dependent upon the individual's sex

under MCL 37.2302(a). Sexual orientation is "inextricably bound up with sex," because a

person's sexual orientation is generally determined by reference to their own sex. *Bostock*,

590 US at ___; 140 S Ct at 1742. For example, attraction to females in a fellow female is

considered homosexual, while the same trait in a male is considered heterosexual; the sex

of the individual at issue is necessary to determine their sexual orientation. To discriminate

on the basis of sexual orientation, then, also requires the discriminator to intentionally treat

individuals differently because of their sex.[13]

---

counsel against applying Title VII precedent to our state law. *Id*. As applied in *Haynie*, the fact that the ELCRA specifically provides a statutory definition of sexual harassment merited a divergence from federal precedent concerning Title VII, whose prohibition of sexual harassment is derived from its general prohibition of sex discrimination. *Id*. at 321-322.

Our agreement with *Bostock* today is not at odds with *Haynie* or *Haynie*'s criticism of blindly applying federal caselaw to state statutory provisions. Unlike the statutory language at issue in *Haynie*, the Michigan Legislature here chose to enact language nearly identical to that in Title VII. Compare 42 USC 2000e-2(a)(1) (prohibiting an employer from discriminating against an individual "because of such individual's race, color, religion, sex, or national origin") with MCL 37.2302(a) (prohibiting discrimination in a place of public accommodation "because of religion, race, color, national origin, age, sex, or marital status"). To the extent that the ELCRA encompasses more activity than Title VII in that it applies to discrimination in public accommodations generally rather than solely in employment, nothing about this breadth of application changes the meaning of the operative words "because of . . . sex" that are found in both statutes. The Michigan Legislature's choice to use the language of Title VII counsels in favor of the persuasive value of that caselaw, and, as expressed earlier, we find this caselaw consistent with our own plain-language interpretation of the ELCRA.

[13] Moreover, discrimination on the basis of sexual orientation also necessarily entails discrimination on the basis of sexual stereotypes. As the United States Court of Appeals for the Second Circuit explained, "stereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women. . . . The gender stereotype at

19

Here, plaintiff Rouch World denied female complainant Johnson's request for services related to her wedding with female complainant Oswalt. Had Johnson instead been a male, Rouch World would not have denied its services. In other words, but for Johnson's sex, Rouch World would have rendered its services to Johnson. Although Rouch World's motivation for its denial of services was based on Johnson's sexual orientation, it is nevertheless true that, holding all other facts constant (including the sex of the romantic

work here is that 'real' men should date women, and not other men[.]" *Zarda v Altitude Express, Inc*, 883 F3d 100, 121 (CA 2, 2018) (quotation marks and citation omitted). See also *Equal Employment Opportunity Comm v R G & G R Harris Funeral Homes*, 884 F3d 560, 576 (CA 6, 2018); *Hively*, 853 F3d at 346-347 (noting that homosexual women "represent[] the ultimate case of failure to conform to the female stereotype (at least as understood in a place such as modern America, which views heterosexuality as the norm and other forms of sexuality as exceptional): [they are] not heterosexual"). Accordingly, discrimination on the basis of sexual orientation signals that individuals who transgress stereotypes associated with their sex are not welcome in the public square. In a plurality opinion, the United States Supreme Court recognized that this type of discrimination also runs afoul of Title VII, reasoning that

> we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for " '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' " [*Price Waterhouse*, 490 US at 251, quoting *Los Angeles Dep't of Water & Power v Manhart*, 435 US 702, 707 & n 13; 98 S Ct 1370; 55 L Ed 2d 657 (1978) (citation omitted).]

Various federal courts have since followed *Price Waterhouse* in recognizing that sex discrimination occurs when an employee suffers an adverse employment action because they defy the socially constructed gender norms. See, e.g., *R G & G R Harris Funeral Homes*, 884 F3d at 576; *Zarda*, 883 F3d at 120-121; *Hively*, 853 F3d at 347.

In considering this line of federal caselaw as applied to Michigan's ELCRA, we agree that discrimination on the basis of sexual orientation necessarily involves discrimination on the basis of sexual stereotypes, and we believe that this theory could serve as an alternate basis for holding that sex discrimination occurred in this case.

partner involved), Rouch World discriminated against Johnson because of her sex.[14] Where the discriminator tolerates certain characteristics in one sex but not the other, discrimination on the basis of sex has occurred. *Id*. at ___; 140 S Ct at 1737 ("An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex."). In sum, a person's sexual orientation necessarily implies conclusions about their sex, and so "it is impossible to discriminate against a person" for their sexual orientation "without discriminating against that individual based on sex." *Id*. at ___; 140 S Ct at 1741.[15]

Plaintiff Rouch World disputes this conclusion, arguing that sex discrimination is not a necessary consequence of discrimination based on sexual orientation. It posits that a person or corporation could enact a blanket policy refusing services to persons of a

---

[14] In dissent, Justice VIVIANO argues that there are actually three factors at hand in this but-for analysis. In addition to sex and sex preference, he argues that sexual orientation is a third relevant fact. According to this approach, our but-for analysis changes both sex and sexual orientation rather than one single factor. This approach ignores that sexual orientation in this context is simply a helpful shorthand for the combination of sex and sex preference; it is not an independent factor. The but-for test cannot, and should not, be evaded through reference to a third, dependent variable that necessarily changes when the protected characteristic also changes.

[15] We note that our conclusion would not change were the sexual orientation at issue bisexual rather than homosexual. A discriminator cannot escape liability for sex discrimination on the basis that the individual discriminated against has a sexual orientation that the discriminator *does* find acceptable in addition to the sexual orientation that the discriminator *does not* find acceptable. For example, had the complainant in the present case been bisexual rather than homosexual, plaintiff Rouch World's denial of services would still constitute sex discrimination because it would be based in a trait—sexual attraction to women—that would have been accepted had the hypothetical complainant been a bisexual or heterosexual man. That one form of expression of the hypothetical complainant's sexual orientation would have been acceptable to the discriminator in each scenario is of no legal consequence.

particular sexual orientation without considering sex at all. Said policy would apply to all persons of that sexual orientation, regardless of whether they are male or female. But this assertion ignores the interdependent relationship between sexual orientation and sex. As the United States Supreme Court explained:

> [Even if] an employer asked homosexual or transgender applicants to tick a box on its application form, . . . the individual applicant's sex [would] still weigh[] as a factor in the employer's decision. . . .
>
> . . . There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words, man, woman, or sex (or some synonym). It can't be done. Likewise, there is no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex. By discriminating against homosexuals, the employer intentionally penalizes men for being attracted to men and women for being attracted to women. . . . Any way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individual's sex . . . . [*Id*. at 1746.]

See also *Hively v Ivy Tech Community College of Indiana*, 853 F3d 339, 350 (CA 7, 2017) ("It would require considerable calisthenics to remove 'sex' from 'sexual orientation.' "). Because one's sex is necessary to the identification of sexual orientation, discrimination on that basis is discrimination on the basis of sex. Incorporating an additional consideration—such as the sex preference of that individual—and retitling that pair of considerations does not remove the effect of sex from the equation. See *Bostock*, 590 US at ___; 140 S Ct at 1741 ("It doesn't matter if other factors besides the plaintiff's sex contributed to the decision."). In other words, the determination of sexual orientation involves both the sex of the individual and the sex of their preferred partner; referring to these considerations jointly as "sexual orientation" does not remove sex from the

22

calculation.[16]  Were this Court to follow the approach proposed by Rouch World and adopted by Justice ZAHRA in dissent, any individual "would be able to rebut a discrimination claim by merely characterizing their action using alternative terminology." *Zarda v Altitude Express, Inc*, 883 F3d 100, 114 (CA 2, 2018).[17]

---

[16] Justice ZAHRA's assertion that "sex" and "sexual orientation" are not equivalent terms is correct, but irrelevant to the analysis.  The narrow reading of "sex" that his dissent offers fails to recognize that when Rouch World discriminates against a person "because she is (A) a woman who is (B) sexually attracted to women, then it is motivated, in part, by an enumerated trait: the employee's sex."  *Hively*, 853 F3d at 359 (Flaum, J., concurring).  "Sexual orientation" does not have to be synonymous with "sex" for the discrimination to be, inherently, sex-based.

[17] Justice VIVIANO agrees that a blanket policy of sexual-orientation discrimination would not run afoul of the ELCRA's prohibition of sex discrimination.  He reasons, in part, that the but-for causation standard, as it has been applied in the context of the ELCRA, contains some requirement of a showing of motivation or intent to discriminate on the basis of the protected characteristic at hand.  And because the discriminator in this scenario intends to discriminate regarding the individual's sexual orientation and not their sex, the but-for causation standard is not met.

We do not, and need not, take a position on Justice VIVIANO's assertion that the but-for causation standard requires some proof of intent to discriminate.  The only issue before this Court is whether discrimination on the basis of sexual orientation is included within the ELCRA's prohibition of discrimination because of sex.  This is the first step in any discrimination analysis under the ELCRA.  See, e.g., *Haynes v Neshewat*, 477 Mich 29, 35; 729 NW2d 488 (2007) (holding that "[i]n order to state a claim under MCL 37.2302(a), [a] plaintiff must establish four elements: (1) discrimination based on a protected characteristic (2) by a person, (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations (4) of a place of public accommodation"); *Hazle v Ford Motor Co*, 464 Mich 456, 463; 628 NW2d 515 (2001) (holding that in the employment context, to establish a prima facie case of discrimination a complainant must "present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination").  Our opinion should not be read as altering precedent governing subsequent steps in a discrimination analysis, such as what evidence is necessary

Further, plaintiff Rouch World's approach would also apply a group-based analysis to the ELCRA that is not supported by its text. Recall that MCL 37.2302(a) prohibits a person or corporation from "[d]eny[ing] *an individual* the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of certain places and services. (Emphasis added.) By using the term "individual" rather than "group," the ELCRA penalizes discriminatory action as applied to individuals, eschewing an analysis that looks instead to the differential treatment of groups. See *Bostock*, 590 US at ___; 140 S Ct at 1740-1741. The ELCRA's prohibition of sex discrimination requires a determination whether a specific individual was treated worse than a member of the opposite sex would have been; it does not ask how one sex-based group is treated as compared to another sex-based group. It is, therefore, no defense for a discriminator "to say it discriminates against both men and women because of sex"—instead, this practice doubles rather than dissolves liability because the ELCRA's focus is on individuals rather than groups. *Id*. at ___; 140 S Ct at 1741 ("This statute works to protect individuals of

---

to prove causation in an enforcement action brought under the ELCRA, and it is unclear why the dissent believes we have done so.

Even if such an intent requirement existed, it would likely be met here given the facts that plaintiffs alleged in their complaint. As discussed earlier, sex is an intrinsic component of sexual orientation. Accordingly, an individual's intent to discriminate on the basis of sexual orientation is sufficient to fulfill any requirement that the individual intended to discriminate on the basis of sex. In the present case, Rouch World asserts that it denied services to the complainants on the basis of their homosexuality. Because sexual orientation is intrinsically linked to sex, this action constitutes sex discrimination. Further, the discriminatory intent evidenced by Rouch World is sufficient to satisfy any motivational requirement possibly encompassed by the but-for causation standard.

24

both sexes from discrimination, and does so equally.").[18]  Were a business to discriminate against both a homosexual male and a homosexual female, the business would be subject to liability under the ELCRA for both because in both cases the business discriminated against the individual for traits it otherwise would have tolerated in a different sex.  See *id*.

Plaintiff Rouch World, along with the dissent, also criticizes this conclusion as inconsistent with the intent of the 1976 Legislature that enacted the ELCRA.  It argues that the ELCRA's legislative history demonstrates that the Legislature intentionally chose to exclude protections from discrimination based on sexual orientation, both at the time of its enactment by declining to include the specific language and repeatedly thereafter by rejecting proposed amendments that would have added the specific language.  However, the legislative history of a statute is relevant to the statute's meaning only where the statute is ambiguous.  See *Luttrell v Dep't of Corrections*, 421 Mich 93, 103; 365 NW2d 74 (1984).  When the statute's language is clear, as it is here, we rely on that plain language as the best evidence of its meaning.  *Shinholster v Annapolis Hosp*, 471 Mich 540, 549; 685 NW2d 275 (2004).[19]  Further, Rouch World's assertion that the 1976 Legislature that enacted

---

[18] Our courts have rejected a similar argument made in the context of applying the ELCRA's prohibition of race discrimination to interracial associations.  Specifically, the Court of Appeals rejected an employer's argument that its blanket policy prohibiting interracial marriage did not violate the ELCRA because it discriminated equally against employees of all races.  See *Bryant v Automatic Data Processing, Inc*, 151 Mich App 424, 430; 390 NW2d 732 (1986) ("If an employer discriminates against a white (or black) employee because of the latter's marriage to a black (or white) spouse, the race of both the employee and the spouse is a motivating factor.  Thus, it must be concluded that the employee in such a case is discriminated against 'because of race' . . . .").  See also *Graham v Ford*, 237 Mich App 670, 677-678; 604 NW2d 713 (1999) (applying *Bryant*).

[19] Even if the rules of construction encouraged consideration of legislative history under the present circumstances, there are often practical difficulties with discerning legislative

intent from legislative history, and those difficulties abound here. Examination of legislative history is necessarily difficult, as "dozens if not hundreds of legislators have their own subjective views on the minutiae of bills they are voting on—or perhaps no views at all because they are wholly unaware of the minutiae." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 392. Discerning a single intent from these hundreds of subjective views is difficult, and Rouch World's and amici's offering of news articles reflecting the opinions of single legislators does little to ease that difficulty. Even sources like bill analyses, committee reports, and floor debate, which may reflect the views of some group of legislators, are of dubious value. See *id*. at 376 (noting that floor statements can be delivered to small or no amount of other legislators and that committee reports are drafted by committee staff and not legislators); *In re Certified Question from the US Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003) (specifically critiquing legislative analyses on the grounds that "(1) such analyses are not an official form of legislative record in Michigan, (2) such analyses do not purport to represent the views of legislators, individually or collectively, but merely to set forth the views of professional staff offices situated within the legislative branch, and (3) such analyses are produced outside the boundaries of the legislative process as defined in the Michigan Constitution").

As noted earlier, there are any number of potential explanations why sexual orientation was not explicitly included in the ELCRA in 1976. Perhaps some legislators believed that sexual-orientation discrimination was necessarily included through the prohibition on sex discrimination and so did not seek its explicit inclusion. Perhaps other legislators believed the opposite. Or perhaps, as plaintiff and some amici also argue, the Legislature did not anticipate that the ELCRA could or would be applied in this manner. See *Bostock*, 590 US at ___; 140 S Ct at 1750-1751. The legislative history is more unclear than Rouch World represents.

As for subsequent legislatures that considered but did not adopt proposed amendments that would add sexual orientation explicitly, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v Price*, 361 US 304, 313; 80 S Ct 326; 4 L Ed 2d 334 (1960). The rejection of subsequent proposed amendments runs into the same difficulties expressed earlier with regard to the statute's initial enactment: there are any number of reasons supporting the rejection of amendments, and the legislative history generally fails to provide a cogent, entity-wide reasoning for that action. See *Bostock*, 590 US at ___; 140 S Ct at 1747. Further, the amendments proposed do not appear to have been brought before the entirety of the Legislature, and so it is especially dubious that their rejection represents rejection by the Legislature as a whole. See *In re Certified Question*, 468 Mich at 115 n 5.

Again, given the lack of ambiguity in the statute's language, this Court need not and should not attempt to decipher the statute's meaning from this varied and enigmatic

ELCRA would not have foreseen the application of its prohibition on discrimination "because of . . . sex" to sexual orientation does not render the statute ambiguous. As recognized by the United States Supreme Court, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v Sundowner Offshore Servs, Inc*, 523 US 75, 79; 118 S Ct 998; 140 L Ed 2d 201 (1998). So while the principal evil motivating the 1976 Legislature to prohibit discrimination on the basis of sex may have been the preferential treatment of males to the detriment of females, this motivation does not curtail other applications of the plain statutory language. See *Bostock*, 590 US at ___; 140 S Ct at 1747 ("Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them."). Notably, both the ELCRA and Title VII have been applied to circumstances likely unanticipated by the enacting Legislature, including pregnancy discrimination, sex-stereotyping cases, same-sex sexual harassment, and retirement accounts. See, e.g., *Robinson v Ford Motor Co*, 277 Mich App 146, 153; 744 NW2d 363 (2007) (allowing liability under the ELCRA for same-sex hostile-work-environment claims); *Price Waterhouse v Hopkins*, 490 US 228, 256; 109 S Ct 1775; 104 L Ed 2d 268 (1989) (opinion of Brennan, J.; superseded by statute on other grounds) (allowing liability under Title VII because the employer's actions "were motivated by stereotypical notions about women's proper deportment"); *Los Angeles Dep't of Water &*

---

legislative history. See *id*. ("Legislative history cannot be used to create an ambiguity where one does not otherwise exist.").

*Power v Manhart*, 435 US 702; 98 S Ct 1370; 55 L Ed 2d 657 (1978) (allowing liability under Title VII for requiring women to make larger pension fund contributions because of their statistically greater longevity). Again, the Legislature's failure to foresee particular statutory applications does not prohibit these applications so long as they are consistent with the plain language of the statute.[20]

Should the Legislature disapprove of an application of a statute's enacted language, the Legislature remains free to amend the statute. This Court, however, is bound by the language that the Legislature has enacted, not what the parties or amici believe the Legislature should have enacted or what any individual representative believed was enacted. See *Oncale*, 523 US at 79.

---

[20] In dissent, Justice ZAHRA argues that this concept does not apply here because this opinion "reads into the ELCRA something that the Legislature expressly considered but rejected . . . ." *Post* at 20 n 51. In support of this assertion, Justice ZAHRA notes that the Civil Rights Committee held a roll-call vote on whether to include sexual orientation in the ELCRA and that the Committee declined to do so by a 5 to 3 vote. He further notes that, on the day the bill was scheduled to be voted out of committee, the committee room was filled with advocates protesting the bill's failure to include an explicit prohibition of sexual-orientation discrimination. But these observations do not demonstrate the intent of the Legislature as a whole. At best, they establish that eight legislators were aware of the bill's failure to include sexual-orientation discrimination specifically and that a majority of those legislators approved of this lack of inclusion. This does not necessarily establish that this majority intended and understood that the ELCRA would not protect against sexual-orientation discrimination—as described earlier, some legislators may have believed it was already included through the prohibition on sex discrimination. And even if the legislative history *did* establish that, it cannot do the same for the remainder of the more than one hundred other legislators that ultimately voted on the ELCRA. See *Reading Law*, p 392. Unlike other cases wherein we have found legislative history to be relevant to the Legislature's intent, the legislative history here does not include changes or alternatives contemplated by the entirety or even the majority of the Legislature. See, e.g., *In re MCI Telecom Complaint*, 460 Mich 396, 415; 596 NW2d 164 (1999).

## IV. CONCLUSION

Discrimination on the basis of sexual orientation necessarily constitutes discrimination because of sex. Accordingly, the denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service" on the basis of sexual orientation constitutes discrimination "because of . . . sex" and, therefore, constitutes a violation of the ELCRA under MCL 37.2302(a). We reverse the Court of Claims' decision to the contrary and remand this case for further proceedings consistent with this opinion.

> Elizabeth T. Clement
> Bridget M. McCormack
> Richard H. Bernstein
> Megan K. Cavanagh
> Elizabeth M. Welch

STATE OF MICHIGAN

SUPREME COURT

ROUCH WORLD, LLC, and UPROOTED
ELECTROLYSIS, LLC,

        Plaintiffs-Appellees,

v

No. 162482

DEPARTMENT OF CIVIL RIGHTS and
DIRECTOR OF THE DEPARTMENT OF
CIVIL RIGHTS,

        Defendants-Appellants.

_____

ZAHRA, J. (*dissenting*).

The Court's majority opinion is a victory for a good many Michiganders who worked diligently and unyieldingly for sexual-orientation equality under the law since the enactment of the Elliott-Larsen Civil Rights Act (the ELCRA), MCL 37.2101 *et seq*., more than 45 years ago.[1] I take no issue with the merits of the policy adopted today by a majority of this Court. I also harbor no doubt that my colleagues in the majority are acting in good faith, with pure hearts and the best of intentions.

Yet under the Michigan Constitution, the Legislature—or the people through the exercise of direct democracy—bears the ultimate responsibility to write, amend, or repeal

---

[1] The ELCRA was drafted, introduced, voted out of both houses of our Legislature, and signed by the Governor in Michigan's 78th legislative session (1975–1976). The ELCRA became effective in 1977, at the expiration of 90 days after the Legislature adjourned *sine die*. See Const 1963, art 4, § 27.

the laws of this state.[2] And this Court's duty is to say what the law is, not what it thinks

the law ought to be.[3] But this is exactly what a majority of this Court has done here. The

majority opinion declares that the ELCRA's prohibition of discrimination "because

of . . . sex" precludes discrimination because of sexual orientation—an interpretation that

eluded the Legislature, the courts, the Michigan Civil Rights Commission (the MCRC),

the Michigan Department of Civil Rights (the MDCR), and the people of Michigan for the

vast majority of the ELCRA's 45-year existence.[4]

---

[2] See Const 1963, art 4, § 1 (vesting the legislative power in the Michigan Legislature); Const 1963, art 4, § 33 (setting forth the process by which "[e]very bill passed by the legislature . . . becomes law"); Const 1963, art 2, § 9 (recognizing the power of the people "to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum").

[3] As aptly stated by Justice Kavanaugh in his dissenting opinion in *Bostock v Clayton Co*, 590 US ___, ___; 140 S Ct 1731, 1836; 207 L Ed 2d 218 (2020), "when this Court usurps the role of [the Legislature], as it does today, the public understandably becomes confused about who the policymakers really are in our system of separated powers, and inevitably becomes cynical about the oft-repeated aspiration that judges base their decisions on law rather than on personal preference."

[4] How this case wound up before us should not be lost on anyone. The MCRC is charged with investigating alleged discrimination prohibited under Michigan law. Const 1963, art 5, § 29. The MCRC does this via the MDCR. See MCL 16.575; MCL 16.577. For more than 40 years, from the enactment of the ELCRA in 1976 until 2018, the MCRC repeatedly and explicitly took the position that sexual-orientation discrimination was *not* prohibited under Michigan law. This understanding was consistent with Michigan caselaw addressing the question. See, e.g., *Barbour v Dep't of Social Servs*, 198 Mich App 183; 497 NW2d 216 (1993). For years, the MCRC tried unsuccessfully to get the Legislature to amend the ELCRA to include sexual orientation as a protected class. These efforts apparently exhausted the MCRC, and, in 2018, it elected to end-run the Legislature by declaring in Interpretive Statement 2018-1 that the ELCRA has always prohibited sexual-orientation discrimination (as well as gender-identity discrimination). The MCRC directed the MDCR to enforce the ELCRA accordingly. In this way, the MCRC invaded both the law-making power exclusively assigned to the Legislature and the judicial power to interpret law exclusively assigned to Michigan's courts.

I would affirm the Court of Claims' conclusion that sexual orientation is not a protected class under the ELCRA. The majority opinion declares that "because of . . . sex" means something that nobody in 1976 thought it meant. In so doing, the majority opinion also declares that phrase to encompass something that the enacting Legislature specifically and explicitly considered including but ultimately chose not to embrace. Whatever one's personal views about what the ELCRA ought to prohibit, its language prohibiting discrimination "because of . . . sex" does not prohibit sexual-orientation discrimination, and it is not within the constitutional power of this Court to alter that language. If we are to be faithful to our constitutional mandate to say what the law is, we simply cannot pretend that the ELCRA says something that it does not say. Because the majority opinion is inconsistent with these bedrock principles of Michigan's constitutional system, I must dissent.

## I. APPLICABLE STANDARD OF REVIEW AND CORRESPONDING RULES OF STATUTORY INTERPRETATION

We review questions of statutory interpretation de novo.[5] " 'The cardinal rule of statutory construction is to discern and give effect to the intent of the Legislature.' "[6] We begin our interpretive inquiry with the words of a statute because they provide the best

---

[5] *American Civil Liberties Union of Mich v Calhoun Co Sheriff's Office*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 163235) (*ACLU of Mich*); slip op at 5; *Dep't of Talent & Economic Dev/Unemployment Ins Agency v Great Oaks Country Club, Inc*, 507 Mich 212, 226; 968 NW2d 336 (2021).

[6] *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011), quoting *Drouillard v Stroh Brewery Co*, 449 Mich 293, 302; 536 NW2d 530 (1995). See also *City of Lansing v Lansing Twp*, 356 Mich 641, 648; 97 NW2d 804 (1959).

3

evidence of the Legislature's intent and its policy choices.[7]  And those words "should be interpreted on the basis of their ordinary meaning and the context within which they are used in the statute."[8]  When statutory language is unambiguous, no further judicial construction is required or permitted because the Legislature is presumed to have intended the meaning it plainly expressed by the words it chose.[9]

Moreover, statutory interpretation involves the search for a statute's original public meaning, which is the meaning that the relevant linguistic community (i.e., legislators, courts, agencies, and reasonably informed members of the public) understood it to possess at the time it was enacted into law.  "[S]tatutes convey meaning only because members of a relevant linguistic community apply shared background conventions for understanding how particular words are used in particular contexts."[10]  Thus, the core of the interpretive

---

[7] *People v Harris*, 499 Mich 332, 345; 885 NW2d 832 (2016), citing *White v Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979).  See also *ACLU of Mich*, ___ Mich at ___; slip op at 5 ("The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language.") (quotation marks and citation omitted); *Dep't of Talent & Economic Development/Unemployment Ins Agency*, 507 Mich at 226 (same principle); *Lash v Traverse City*, 479 Mich 180, 187; 735 NW2d 628 (2007) ("When interpreting a statute, our primary obligation is to ascertain and effectuate the intent of the Legislature.  To do so, we begin with the language of the statute, ascertaining the intent that may reasonably be inferred from its language.") (citations omitted).

[8] *People v Zajaczkowski*, 493 Mich 6, 13; 825 NW2d 554 (2012), citing *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999).

[9] *ACLU of Mich*, ___ Mich at ___; slip op at 5, citing *2 Crooked Creek, LLC v Cass Co Treasurer*, 507 Mich 1, 9; 967 NW2d 577 (2021) ("When the statutory language is clear and unambiguous, judicial construction is not permitted and the statute is enforced as written.") (quotation marks and citation omitted).

[10] Manning, *The Absurdity Doctrine*, 116 Harv L Rev 2387, 2457 (2003); see also *id*. at 2392-2393 (explaining that proper statutory interpretation asks "how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in

enterprise is discovering what the linguistic community's chosen words meant to that community at the time those words became law.[11]

## II. ANALYSIS

This Court is constitutionally entrusted with the privilege of interpreting the duly enacted laws of Michigan. But the majority opinion's holding that the ELCRA has *always* prohibited sexual-orientation discrimination amounts to an exercise of legislative, not judicial, power. The relevant evidence, all of which establishes the historical-linguistic context necessary for an accurate interpretation of the ELCRA, demonstrates that the best reading of the ELCRA is that it prohibits *sex* discrimination, i.e., differential, negative treatment of persons of one gender vis-à-vis persons of the other gender, not *sexual-orientation* discrimination.

---

context. This approach recognizes that the literal or dictionary definitions of words will often fail to account for settled nuances or background conventions that qualify the literal meaning of language and, in particular, of legal language").

[11] See Solum, *Cooley's Constitutional Limitations and Constitutional Originalism*, 18 Geo J L & Pub Pol'y 49, 63 (2020), quoting Cooley, *Constitutional Limitations* (1st ed), p 38 n 1 (" 'Interpretation is the act of finding out the true sense of any form of words, that is, the sense which their author intended to convey, and of enabling others to derive from them the same idea which the author intended to convey . . . .' ") (quotation marks and citation omitted). See also Manning, *What Divides Textualists from Purposivists?*, 106 Colum L Rev 70, 79-80 (2006) ("Because one can make sense of others' communications only by placing them in their appropriate social and linguistic context, textualists further acknowledge that '[i]n textual interpretation, context is everything.' ") (citation omitted).

## A. THIS COURT IS NOT CONSTITUTIONALLY AUTHORIZED TO MAKE POLICY, AND FOR IT TO DO SO SERIOUSLY UNDERMINES MICHIGAN'S CONSTITUTIONAL ORDER

In 1963, the people of the state of Michigan, in whom "[a]ll political power is inherent,"[12] adopted our state's Constitution, which separates the legislative, executive, and judicial powers into three distinct branches: the Legislature, the Governor, and the courts.[13] In so doing, the people of Michigan delegated to the Legislature " 'the legislative power of the State of Michigan[.]' "[14] Put another way, Michigan's Constitution vests in the Legislature "the power to make laws,"[15] or "the rules by which the duties and rights of every citizen are to be regulated."[16] Michigan's Constitution also vests in the judicial branch of government the power to interpret and apply the law.[17]

---

[12] Const 1963, art 1, § 1.

[13] Const 1963, art 3, § 2.

[14] *Coalition of State Employee Unions v Michigan*, 498 Mich 312, 332; 870 NW2d 275 (2015), citing Const 1963, art 4, § 1; see also *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 65; 718 NW2d 784 (2006) ("It is the legislators who establish the statutory law because the legislative power is exclusively theirs."), overruled on other grounds by *Regents of Univ of Mich v Titan Ins Co*, 487 Mich 289 (2010); *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 98 n 18, 117; 754 NW2d 259 (2008).

[15] *In re Complaint of Rovas*, 482 Mich at 98.

[16] The Federalist No. 78 (Hamilton) (Rossiter ed, 1961), p 465.

[17] See *Johnson v Kramer Bros Freight Lines, Inc*, 357 Mich 254, 258; 98 NW2d 586 (1959), quoting 16 CJS, Constitutional Law, § 144, p 687 (" 'The primary functions of the judiciary are to declare what the law is and to determine the rights of parties conformably thereto.' "). See also *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803) (stating that "[i]t is emphatically the province and duty of the judicial department to say what the law is").

The separation of powers is an indispensable part of our constitutional system, and its cultivation and preservation provides the context within which the exercise of liberty is made possible. "By separating the powers of government, the framers of the Michigan Constitution sought to disperse governmental power and thereby to limit its exercise. '[T]here [is] no liberty . . . if the power of judging be not separated from the legislative and executive powers.' "[18]

The federal system also features the separation of powers, and by looking to that system, we can better comprehend the function and purpose of the separation of powers in Michigan.[19] The Supreme Court of the United States has explained that the separation of powers is intended to preserve the constitutional system of "checks and balances . . . built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other."[20] The "first

---

[18] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 613; 684 NW2d 800 (2004), quoting The Federalist No. 47 (Madison) (Rossiter ed, 1961), p 299 (alterations in *Nat'l Wildlife Federation*), overruled on other grounds by *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349 (2010).

[19] See *Nat'l Wildlife Federation*, 471 Mich at 613 n 5, quoting *Schwartz v Flint*, 426 Mich 295, 306; 395 NW2d 678 (1986) ("The separation of powers provision in [the Michigan Constitution] is 'in harmony with American political theory, the State government [being] divided into the three historic departments, the legislative, executive, and judicial . . . .' ").

[20] *Buckley v Valeo*, 424 US 1, 122; 96 S Ct 612; 46 L Ed 2d 659 (1976), relying on The Federalist No. 51 (Madison) (Putnam's Sons ed, 1908), pp 323-324. See also *Consumer Energy Council of America v Fed Energy Regulatory Comm*, 218 US App DC 34, 80; 673 F2d 425 (1982) ("The fundamental purpose of [the separation of powers] is to check the extent of power exercisable by any one branch of Government in order to protect the people from oppression."), relying on *Buckley*, 424 US at 122, aff'd sub nom *Process Gas Consumers Group v Consumer Energy Council of Am*, 463 US 1216 (1983). Accord The Federalist No. 47 (Madison) (Rossiter ed, 1961), p 301 ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many,

7

purpose" of the separation of powers is "to prevent an unnecessary and therefore dangerous concentration of power in one branch."[21]  The separation of powers is also "intended, in part, to protect each branch of government from incursion by the others."[22]

Pursuant to this constitutional structure, policymaking is fundamentally a legislative prerogative.[23]  As between the Legislature and this Court, we have recognized that the Legislature is the superior institution for creating the public policy of this state:

> As a general rule, making social policy is a job for the Legislature, not the courts.  This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's.[24]

---

and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny.").

[21] *Chadha v Immigration & Naturalization Serv*, 634 F2d 408, 422 (CA 9, 1980), aff'd 462 US 919 (1983).

[22] *Bond v United States*, 564 US 211, 222; 131 S Ct 2355; 180 L Ed 2d 269 (2011).  The separation of powers does more than just restrain the branches.  See *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2135; 204 L Ed 2d 522 (2019) (Gorsuch, J., dissenting) (explaining that "enforcing the separation of powers" is also about "safeguarding a structure designed to protect [the people's] liberties, minority rights, fair notice, and the rule of law").

[23] *Blank v Dep't of Corrections*, 462 Mich 103, 116; 611 NW2d 530 (2000); *American States Ins Co v Detroit Auto Inter-Ins Exch*, 117 Mich App 361, 367; 323 NW2d 705 (1982).

[24] *Woodman v Kera LLC*, 486 Mich 228, 245-246; 785 NW2d 1 (2010) (quotation marks and citations omitted).  Accord *Terrien v Zwit*, 467 Mich 56, 67; 648 NW2d 602 (2002), citing *Van v Zahorik*, 460 Mich 320, 327; 597 NW2d 15 (1999).

8

Accordingly, courts are "not to second-guess [the Legislature's] policy decisions or to change the words of a statute in order to reach a different result."[25] And just because legislation "appears undesirable, unfair, unjust or inhumane does not of itself empower a court to override the [L]egislature and substitute its own solution."[26] "We do not sit as the 'legislators in chief' of this state," standing at the ready to update the Legislature's work product that we find " 'cumbersome,' 'impractical,' or 'inadequately precise.' "[27]

All this to say, this Court's duty is "to interpret the statute as we find it. The wisdom of the provision in question in the form in which it was enacted is a matter of legislative responsibility with which courts may not interfere."[28] In our system of government, this Court's function is "to fairly interpret a statute as it then exists; it is not the function of the

---

[25] *Harris*, 499 Mich at 345. See also *Pontiac Sch Dist v Pontiac*, 262 Mich 338, 353; 247 NW 474 (1933) ("The constitutional duty of courts is to interpret and apply the law, not to enact laws."), abrogated on other grounds by *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42 (2018).

[26] *Doe v Dep't of Social Servs*, 439 Mich 650, 681; 487 NW2d 166 (1992) (quotation marks and citation omitted). See also *Johnson v Recca*, 492 Mich 169, 187; 821 NW2d 520 (2012), quoting *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 759; 641 NW2d 567 (2002) (holding that "our judicial role 'precludes imposing different policy choices than those selected by the Legislature' " and, therefore, "the judicial branch cannot amend [a statute] to make it 'better' " because "[t]hat is an authority reserved solely to the Legislature") (quotation marks and citation omitted).

[27] See *People v Dunbar*, 499 Mich 60, 71-72; 879 NW2d 229 (2016), citing *Lansing Mayor v Pub Serv Comm*, 470 Mich 154, 163-164; 680 NW2d 840 (2004), superseded by statute as stated in *South Dearborn Environmental Improvement Ass'n v Dep't of Environmental Quality*, 502 Mich 349, 363-365; 917 NW2d 603 (2018).

[28] *City of Lansing*, 356 Mich at 648 (quotation marks and citation omitted). Accord *People v Detroit, GH & M R Co*, 228 Mich 596, 612; 200 NW 536 (1924) ("[C]ourts cannot make laws; they can but interpret them in conformity with the legislative intent."). See also *Dunbar*, 499 Mich at 71-72 (explaining that the authority to rewrite statutes rests with the Legislature, not this Court).

9

court to legislate."[29]  Thus, "[i]n accordance with the constitution's separation of powers, this Court cannot revise, amend, deconstruct, or ignore [the Legislature's] product and still be true to our responsibilities that give our branch only the judicial power."[30]  The foregoing principles, when taken together and adhered to, prevent "the judiciary from usurping the powers of the political branches,"[31] which also serves to uphold the people's chosen constitutional structure, under which the power and duty to write laws belongs to the Legislature, not this Court.

## B.  THE ELCRA, AS WRITTEN, DOES NOT PROHIBIT SEXUAL-ORIENTATION DISCRIMINATION

I would affirm the Court of Claims' conclusion that sexual orientation is not a protected class under the ELCRA and, consequently, would also affirm the result in *Barbour*.[32]  The majority opinion fails to read "because of . . . sex" in its proper context, as those words were understood in 1976, when the Legislature passed the ELCRA.  Because

---

[29] *Roosevelt Oil Co v Secretary of State*, 339 Mich 679, 694; 64 NW2d 582 (1954).

[30] *In re Complaint of Rovas*, 482 Mich at 98 (quotation marks and citation omitted; brackets in original).  Accord *People v Steanhouse*, 500 Mich 453, 489; 902 NW2d 327 (2017) (MARKMAN, C.J., concurring in part and dissenting in part).

[31] *Mich Chiropractic Council v Comm'r of Office of Fin and Ins Servs*, 475 Mich 363, 374; 716 NW2d 561 (2006) (opinion of YOUNG, J.); *id*. at 387 (MARKMAN, J., concurring in part), overruled on other grounds by *Lansing Sch Ed Ass'n*, 487 Mich 349.

[32] *Barbour*, 198 Mich App at 185 (holding that "harassment or discrimination based upon a person's sexual orientation is not an activity proscribed by the [ELCRA]").  As the majority opinion notes, *Barbour* adopted, without independent analysis, the conclusion of various federal circuit courts, which held decades ago that Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq*., does not prohibit sexual-orientation discrimination.  Those cases were overruled by *Bostock*.  But I can, and would, affirm *Barbour*'s result because my opinion does not rely on and is not controlled by the reasoning of *Bostock*.

10

the word "sex" is not expressly defined in the ELCRA, the Court may consult dictionary definitions to determine its meaning.[33] The relevant meaning is to be found in dictionaries that existed prior to the ELCRA's enactment (or slightly after, given that " '[d]ictionaries tend to lag behind linguistic realities' "[34]).

The *American Heritage Dictionary* (1970) provides the following definitions for "sex":

> 1. a. The property or quality by which organisms are classified according to their reproductive functions. b. Either of two divisions, designated *male* and *female*, of this classification. 2. Males or females collectively. 3. The sexual urge or instinct as it manifests itself in behavior. 4. Sexual intercourse.[35]

Similarly, *Webster's New Collegiate Dictionary* (1976) defines "sex" as follows:

> 1 : either of two divisions of organisms distinguished respectively as male or female[;] 2 : the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females[;] 3 a : sexually motivated phenomena or behavior[;] b: SEXUAL INTERCOURSE[;] 4 : GENITALIA[.][36]

---

[33] *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997) (stating that "when terms are not expressly defined by a statute, a court may consult dictionary definitions"). To avail ourselves of dictionaries is consistent with the Legislature's command in MCL 8.3a that "[a]ll words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."

[34] *People v Wood*, 506 Mich 114, 123 n 7; 954 NW2d 494 (2020), quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 419.

[35] *American Heritage Dictionary* (1970) (boldface omitted).

[36] *Webster's New Collegiate Dictionary* (1976) (boldface omitted).

11

Examples abound.[37]

---

[37] Every dictionary published before 1977 that I examined lists biological sex—the distinction between male and female—as its focal definition of "sex." See, e.g., *Webster's Third New International Dictionary* (1966) ("**1:** one of the two divisions of organic esp. human beings respectively designated male or female[;] **2:** the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu. genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness with one or the other of these being present in most higher animals though both may occur in the same individual in many plants and some invertebrates and though no such distinction can be made in many lower forms (as some fungi, protozoans, and possibly bacteria and viruses) either because males and females are replaced by mating types or because the participants in sexual reproduction are indistinguishable[;] **3:** the sphere of interpersonal behavior esp. between male and female most directly associated with, leading up to, substituting for, or resulting from genital union[;] **4:** the phenomenon of sexual instincts and their manifestations") (usage examples omitted); *Webster's Seventh New Collegiate Dictionary* (1969) ("**1:** either of two divisions of organisms distinguished respectively as male or female[;] **2:** the sum of the structural, functional, and behavioral peculiarities of living beings that subserve reproduction by two interacting parents and distinguish males and females[;] **3 a:** sexually motivated phenomena or behavior[;] **b:** SEXUAL INTERCOURSE"); *The Random House Dictionary* (1971) (**1.** the fact or character of being either male or female. **2.** either of the two groups of persons exhibiting this character. **3.** the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences. **4.** the instinct or attraction drawing one sex toward another, or its manifestation in life and conduct. **5.** coitus. **6.** to have sex, *informal*, to engage in sexual intercourse. **7.** to ascertain the sex of, esp. of newly-hatched chicks. **8.** sex it up, slang. to neck passionately. **9.** sex up, *informal*. **a.** to arouse sexually. **b.** to increase the appeal of; to make more interesting, attractive, or exciting.") (usage examples omitted); *Webster's New World Dictionary of the English Language* (2d college ed, 1974) ("**1.** either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions[;] **2.** the character of being male or female; all the attributes by which males and females are distinguished[;] **3.** anything connected with sexual gratification or reproduction or the urge for these; esp., the attraction of those of one sex for those of the other[;] **4.** sexual intercourse").

The same is true of a dictionary published slightly after the ELCRA's enactment into law, which is appropriate to consult given that " '[d]ictionaries tend to lag behind linguistic realities,' " *Wood*, 506 Mich at 123 n 7, quoting *Reading Law*, p 419. See *Webster's New Twentieth Century Dictionary* (1983) (defining "sex" as "1. either of the

The litigants debate the breadth of the definition of "sex." As noted in the majority opinion, "[p]laintiff Rouch World and certain amici propose a narrower definition of 'sex' that defines the word as 'whether one is a biological male or biological female'; but defendants and other amici propose a more expansive definition that incorporates physiological, structural, and behavioral characteristics."[38] The majority opinion "use[s] but do[es] not affirmatively rule in favor of the more restrictive definition,"[39] concluding that defendants prevail even under this narrower definition.

---

two divisions of organisms distinguished as male or female; males or females (especially men or women) collectively. 2. the character of being male or female; all of the things which distinguish a male from a female. 3. anything connected with sexual gratification or reproduction or the urge for these, especially the attraction of individuals of one sex for those of the other. 4. the female sex; women: with the article *the*. *sex appeal*, sex attraction, or the quality or qualities of an individual that are attractive to a member of the opposite sex. *the fair* (or *gentle*, *weaker*) *sex*; women. *the sterner* (or *stronger*) *sex*; men"). See also *American Heritage Dictionary* (1979) (entry for "sex" identical to *American Heritage Dictionary* (1970)).

Finally, the definition of "sex" in *Webster's Third* (1966) is particularly notable because the publication of that dictionary accompanied "a new era" for dictionaries as a whole: "one in which describing how people use language became more important than showing them how to do so properly." King, *The Draconian Dictionary Is Back*, The Atlantic (August 5, 2018) <https://www.theatlantic.com/technology/archive/2018/08/the-draconian-dictionary-is-back/566660/> (accessed July 23, 2022) [https://perma.cc/LBT8-JQKM]. That is, *Webster's Third* is a "descriptivist" dictionary, and "[d]escriptivist lexicographers, steeped in linguistic theory, eschew value judgements about so-called correct English and instead describe how people are using the language." *Id*. That the focal definition of "sex" in *Webster's Third* is the male-female distinction is therefore good evidence that biological sex is what was meant by the ELCRA's drafters when they included sex as a protected class.

[38] *Ante* at 17-18.

[39] *Ante* at 18.

Contrary to the position expressed by defendants and adopted arguendo by the majority opinion, I conclude that the ELCRA's use of "sex" refers to whether one is a biological male or a biological female, as illustrated by the definitions set forth earlier. But, contrary to the majority opinion, I conclude that defendants do not prevail under that narrower definition. This is so because no person familiar with the common usage of the English language in 1976 would have understood the ordinary meaning of "sex" to include "sexual orientation." Simply stated, if discrimination "because of . . . sex" retains its original, plain, and single meaning of treating similarly situated biological women differently and worse than similarly situated biological men, and vice versa,[40] then

---

[40] This Court has held that, under the ELCRA, "the essence of a sex discrimination civil rights suit is that similarly situated people have been treated differently because of their sex." *Radtke v Everett*, 442 Mich 368, 379; 501 NW2d 155 (1993). See also *Diamond v Witherspoon*, 265 Mich App 673, 683; 696 NW2d 770 (2005) (same). The Supreme Court of the United States has joined us in the context of Title VII, on which the ELCRA was "clearly modeled." *Rasheed v Chrysler Corp*, 445 Mich 109, 123 n 20; 517 NW2d 19 (1994). In *Oncale v Sundowner Offshore Servs, Inc*, 523 US 75; 118 S Ct 998; 140 L Ed 2d 201 (1998), the Court unanimously adopted Justice Ginsburg's understanding of sex discrimination, stating that it occurs for purposes of Title VII when " 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Id*. at 80, quoting *Harris v Forklift Sys, Inc*, 510 US 17, 25; 114 S Ct 367; 126 L Ed 2d 295 (1993) (Ginsburg, J., concurring). In other words, the ELCRA's prohibition of discrimination "because of . . . sex" prohibits "double standards for men and women—policies that disfavor at least some individuals of one sex compared with similarly situated members of the other." Anderson, *On the Basis of Identity: Redefining "Sex" in Civil Rights Law and Faulty Accounts of "Discrimination,"* 43 Harv J L & Pub Pol'y 387, 390 (2020).

A clear example that showcases what sex discrimination is comes from a case argued by then-advocate Ginsburg herself: *Weinberger v Wiesenfeld*, 420 US 636; 95 S Ct 1225; 43 L Ed 2d 514 (1975). In *Weinberger*, the Supreme Court of the United States held that a sex-based distinction in the disbursement of Social Security survivor's benefits violated the Fifth Amendment's Due Process Clause. *Id*. at 654. Prior to *Weinberger*, a widow (and her children) could receive Social Security survivor's benefits, but only a widower's *children* could receive them, *not the widower himself*. *Id*. The Court held that

defendants' argument that the ELCRA prohibits sexual-orientation discrimination on the basis of its prohibition of discrimination "because of . . . sex" fails.[41]

Defendants claim, and the majority opinion holds, that plaintiff's refusal to participate in the celebration of complainants' homosexual marriage amounts to unlawful discrimination "because of . . . sex" under the ELCRA, on the ground that plaintiff's refusal necessarily implicates sex. The heart of defendants' argument is that " '[b]ecause one cannot fully define a person's sexual orientation without identifying his or her sex,

_____

the sex discrimination consisted in the fact that male surviving spouses were treated differently and worse than their female counterparts, on account of, or by reason of, or because of, their sex; had they been women (widows), they would have received the surviving-spouse benefits, but because they were men (widowers), they were ineligible for those benefits. That is, male surviving spouses were subjected to a "double standard[]" that "disfavor[ed] at least some individuals of one sex compared with similarly situated members of the other." *On the Basis of Identity*, 43 Harv J L & Pub Pol'y at 390. Said another way, male surviving spouses were " 'exposed to disadvantageous terms or conditions' " to which female surviving spouses were " 'not exposed.' " *Oncale*, 523 US at 80, quoting *Harris*, 510 US at 25 (Ginsburg, J., concurring). Said still another way, and borrowing this Court's own words, "similarly situated people [were] treated differently because of their sex." *Radtke*, 442 Mich at 379; see also *Diamond*, 265 Mich App at 683.

[41] While not directly applicable, this Court has previously stated that the ELCRA does not prohibit sexual-orientation discrimination:

> [N]one of the exceptions where a suit is allowed against the government can be read to allow suit for sexual orientation discrimination. Likewise, no statute grants governmental agencies the authority to create an immunity exception for sexual orientation discrimination or waive immunity in the area of civil rights. *Notably, the* [*ELCRA*]*, which makes a municipality liable for specific civil rights violations, neither provides a cause of action for sexual orientation discrimination nor grants municipalities the authority to create one.* MCL 37.2101 *et seq.* Moreover, the [ELCRA] limits complaints to causes of action for violations of the act itself[.] [*Mack v Detroit*, 467 Mich 186, 196; 649 NW2d 47 (2002).]

sexual orientation is a function of sex.' "[42]  But this logic embodies a false premise.  Sex can, and does, exist and can be determined without reference to sexual orientation.  That is, sexual orientation may depend on sex, but sex does not depend on sexual orientation.  Thus, sex and sexual orientation are not equivalent terms.  A person need not know anything about another person's biological sex in order to know if that person has a homosexual orientation.  For example, if an employer receives a referral that he "should hire Sam, who happens to be a homosexual," the employer could refuse to hire Sam because of his or her sexual orientation without ever even knowing Sam's biological sex.  Knowledge about another person's biological sex is not necessary to influence one's actions toward that other person on the basis of his or her sexual orientation.  These two terms simply are not interchangeable.

> Consider the following hypothetical scenario provided by plaintiffs:
>
> A conference hall has four people request to use their facility on the same day at the same time.  The conference hall only has two rooms available so the owner can only approve two of the four people to use the facility.  The four people are a straight man, a gay man, a straight woman, and a gay woman.  If the owner has a bias against the female "sex," then the owner will approve the requests of the straight man and the gay man.  However, if the owner has a bias against a "sexual orientation," then the owner will approve the request of the straight man and the straight woman.[43]

As plaintiffs conclude, this illustrates that sex and sexual orientation are distinct concepts.  Clearly, a bias rooted in gender produces one result, whereas a bias rooted in sexual

---

[42] Defendants-Appellants' Brief on Appeal (October 22, 2021) at 14, quoting *Zarda v Altitude Express, Inc*, 883 F3d 100, 113 (CA 2, 2018).

[43] Plaintiffs-Appellees' Brief on Appeal (November 26, 2021) at 17.

orientation produces an entirely different result.[44] Because the discriminatory results of these biases are different, it is abundantly clear that sex and sexual orientation are not the same.[45]

Defendants attempt to avoid this conflict by insisting on a cherry-picked, broader definition of sex, which they proffer contrary to statutory context. But they do not prevail even with that broader definition. Specifically, defendants rely on one of the possible

---

[44] The majority opinion attempts to respond by once again asserting, with different phrasing, that "when [someone] discriminates against a person 'because she is (A) a woman who is (B) sexually attracted to women, then it is motivated, in part, by an enumerated trait: the employee's sex.'" *Ante* at 23 n 16, quoting *Hively v Ivy Tech Community College of Indiana*, 853 F3d 339, 359 (CA 7, 2017) (Flaum, J., concurring). On that basis, the majority opinion concludes that discrimination "because of . . . sex" necessarily entails sexual-orientation discrimination. However, as I have shown, it is possible to make decisions based on sex alone and on sexual orientation alone, and that possibility fatally undermines the majority opinion's logic. See pages 14-17 of this opinion. More importantly, as I have explained at length, this Court's duty is *interpretation*: determining and then applying the meaning that the ELCRA possessed for the linguistic community that passed it into law. See pages 6-10 of this opinion. Nobody in 1976 thought that the ELCRA's prohibition of discrimination "because of . . . sex" included a prohibition on discrimination because of sexual orientation. And yet, today, a majority of this Court, "rather than members of [the Legislature]," sees fit to "impos[e] on a [nearly] half-century-old statute a meaning of 'sex discrimination' that the [Legislature] that enacted it would not have accepted," *Hively*, 853 F3d at 357 (Posner, J., concurring) (alterations added)—indeed, not only would not have accepted but *explicitly did not accept*. See pages 19-25 of this opinion for discussion of this point. Such an act is anathema to the judicial role and will seriously undermine Michigan's constitutional order if repeatedly indulged.

[45] See *Bostock*, 590 US at ___; 140 S Ct at 1835 (Kavanaugh, J., dissenting) (observing that to discriminate on the basis of sex as opposed to sexual orientation "implicates two distinct societal concerns, reveals two distinct biases, imposes two distinct harms, and falls within two distinct statutory prohibitions").

meanings of "sex": "The sexual urge or instinct as it manifests itself in behavior."[46] It is entirely unsurprising that a dictionary includes within its definition of "sex" the desire to engage in sexual activity. But this in no way proves that the ordinary meaning of the word "sex" in 1976, especially as that term was used in the ELCRA, included sexual orientation.

Instead of addressing the actual intent of the ELCRA's drafters, defendants inappropriately argue that the fact that there exists a definition for sex that has to do with sexual activity or behavior means that this meaning of the word must be included among the ELCRA's protections. However, there is no rule of construction suggesting that the Legislature must have intended all possible meanings of a word it used. On the contrary, statutory terms "must be interpreted on the basis of their ordinary meaning and the context in which they are used."[47]

The ELCRA was not enacted to protect the expression of sexual behavior or the act of sexual intercourse, which are possible meanings under defendants' preferred definition of sex. For example, no reasonable person would conclude that the ELCRA's prohibition on discrimination "because of . . . sex" would protect a person from being fired from his or her job for having sexual intercourse while at work, even though that is a possible meaning

---

[46] *American Heritage Dictionary* (1970); see also *American Heritage Dictionary* (1979) (same).

[47] *Zajaczkowski*, 493 Mich at 13. See also *Absurdity Doctrine*, 116 Harv L Rev at 2392-2393, 2457; *What Divides Textualists from Purposivists?*, 106 Colum L Rev at 78, 79-80.

of "sex."[48] Context and intent matter when interpreting statutes.[49] Just because courts may consult dictionaries for assistance does not mean they must robotically and blindly follow any and all of their definitions. This Court has always recognized and enforced this commonsense rule.[50]

When read in context it becomes eminently clear that the plain and ordinary meaning of the word "sex" in 1976 did not include sexual orientation.[51] This conclusion

---

[48] Rather, the ELCRA "is aimed at the prejudices and biases borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Miller v C A Muer Corp*, 420 Mich 355, 363; 362 NW2d 650 (1984) (quotation marks and citations omitted). Thus, that the ELCRA protects persons who engage in sexual activity while at work is simply not a reasonable interpretation.

[49] *Zajaczkowski*, 493 Mich at 13. See also *Absurdity Doctrine*, 116 Harv L Rev at 2392-2393, 2457; *What Divides Textualists from Purposivists?*, 106 Colum L Rev at 78, 79-80. Accord *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 307; 952 NW2d 358 (2020) ("[T]his Court will not extract words and phrases from within their context or otherwise defeat their import as drawn from such context. A statute should be interpreted in light of the overall statutory scheme, and although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context.") (quotation marks, citations, and brackets omitted).

[50] See, e.g., *Dep't of Environmental Quality v Worth Twp*, 491 Mich 227, 238; 814 NW2d 646 (2012) ("When considering the correct interpretation, the statute must be read as a whole, unless something different was clearly intended. Individual words and phrases, while important, should be read in the context of the entire legislative scheme.").

[51] The majority opinion finds it notable that the ELCRA has been applied to circumstances "likely unanticipated" by the enacting Legislature. The majority opinion claims that this proposition in regard to the ELCRA is supported by *Robinson v Ford Motor Co*, 277 Mich App 146, 153; 744 NW2d 363 (2007), which first greenlighted claims under the ELCRA for a same-sex hostile work environment. See Gordon, *A History of the Development of Sex Discrimination Law in Michigan*, 97 Mich B J 30, 33 (2018). *Robinson* concerned a defendant employee who repeatedly committed unwelcome and depraved sexual acts against a plaintiff employee of the same gender. Regardless of either employee's sexual

is bolstered by the ELCRA's prepassage history, which shows that the Legislature specifically and explicitly considered adding, but ultimately declined to add, sexual orientation as a protected class in the ELCRA. Before the ELCRA became law, the director of the Detroit Human Rights Department (the DHRD) sent a letter to Representative Perry Bullard, then the chair of the Michigan House of Representatives' Civil Rights Committee (the Committee).[52] The DHRD's letter flagged what it took to be a flaw in the proposed language of the ELCRA (then House Bill 4055). Unlike the "Declaration of Rights" in the city of Detroit's new charter, HB 4055 did not include sexual orientation as a protected class. The East Lansing Human Relations Commission also sent a letter to Representative Bullard and the Committee, urging the addition of sexual orientation as a protected class. On June 5, 1975, the Committee held a roll-call vote on whether to include sexual orientation, and by a 5 to 3 vote, it declined to add that language. "On the day that the bill was scheduled to be voted out of committee," the committee room was filled with "gay[]

orientation, *Robinson* addressed actual sexual harassment that the ELCRA was intended, or anticipated, to prohibit.

The majority opinion simply chooses to ignore the longstanding rule of statutory interpretation that this Court is "aided in discovering legislative intent . . . by examining the proposed legislation [that the Legislature] considered and rejected, contrasted with the provisions as finally adopted." *Miller v State Farm Auto Ins Co*, 410 Mich 538, 566; 302 NW2d 537 (1981). And where, as here, the Legislature considered certain language and rejected it, we should not, indeed we cannot, read the statute to include that which the Legislature expressly rejected. See notes 78 and 79 of this opinion and associated text. Because the majority opinion reads into the ELCRA something that the Legislature expressly considered but rejected, it can only be characterized as a brazen act of judicial overreach.

[52] This document and related materials were submitted in the appendix to plaintiffs' brief on appeal.

20

and lesbian[] . . . advocates who . . . claim[ed] that the proposed law, as drafted, was short sighted" because it did not protect gays and lesbians.[53]  Their appeal fell on deaf ears.  One of the bill's cosponsors, Representative Mel Larsen, later admitted that it was very unlikely that the ELCRA would have made it out of the House had it been amended to include sexual orientation as a protected class.[54]  The Legislature therefore made a political choice to not extend the ELCRA to prohibit sexual-orientation discrimination, and it did so with the understanding that, by not including sexual orientation as a protected class, discrimination on that basis would not be prohibited by the ELCRA.[55]

---

[53] Gubbins, *Legal Milestone Honors Elliot*[*t*]*-Larsen Civil Rights Act*, Oakland County Legal News (September 17, 2012) <http://www.legalnews.com/oakland/1367237> (accessed July 23, 2022) [https://perma.cc/75K6-9NG3].

[54] Skubick*, Who is Elliott and Who is Larsen?  Groundbreakers, That's Who*, MLive (November 23, 2014) <https://www.mlive.com/lansing-news/2014/11/tim_skubick_who_is_elliott_and.html> (accessed July 23, 2022) [https://perma.cc/4HTQ-E9ZJ] (Representative Larsen "recall[ed] the movement was focused on the African American community.  Period. . . .  [W]hen the bill did pass, it came down to practical political calculus.  Put gays in the measure and the whole thing implodes.  Leave them out, and the bill passes.").

[55] Importantly, however, we know that the Legislature knows how to identify and protect sexual orientation when it wants to; but it did not do so, and to date has not done so, with the ELCRA.  See MCL 28.257a (requiring "[t]he chief of police of each city or village, the chief of police of each township having a police department, and the sheriff of each county within this state" to "report to the department of state police, in a manner prescribed by the department, information specified under [MCL 28.251] related to crimes motivated by prejudice or bias based upon race, ethnic origin, religion, gender, or *sexual orientation*") (emphasis added).  See also MCL 141.1361(10)(a) and (b) (prohibiting the board of directors of a regional convention facility authority created under MCL 141.1357 and the authority itself from discriminating against employees, applicants, or contractors "because of religion, race, color, national origin, age, sex, *sexual orientation*, height, weight, marital status, partisan considerations, or a disability or [certain] genetic information") (emphasis added).  Such a linguistic difference—"sex" as opposed to "sexual orientation"—matters when it comes to discerning the Legislature's intended meaning.  See *ACLU of Mich*, ___ Mich at ___; slip op at 1-2, 12, 14 (unanimously holding that a statute, MCL 15.243(1)(d),

21

Crucially, when discharging its interpretive responsibilities, this Court has recognized repeatedly that "where the Legislature has affirmatively rejected language that would support an interpretation of a statute, that rejection evidences a legislative intent toward a contrary construction."[56]  Again, this Court's interpretive lodestar is the Legislature's intent, best evidenced by the words it chose to comprise a statute, and the Court is "aided in discovering legislative intent . . . by examining the proposed legislation [that the Legislature] considered and rejected, contrasted with the provisions as finally

---

that "exempt[s] from disclosure as a public record . . . [r]ecords or information specifically described and exempted from disclosure by statute" does not exempt from disclosure such records or information when the basis for that exemption is a *regulation* because "a regulation is not a statute," and the Legislature's "deliberate linguistic choice" to use "statute," which this Court was "bound to respect," matters and, indeed, was "dispositive").

Moreover, the Legislature knows how to expand, or clarify, what conduct constitutes discrimination "because of . . . sex."  Indeed, the Legislature has twice expressly done so.  First, it amended the ELCRA to provide that employment-based discrimination "because of . . . sex" includes discrimination because of pregnancy or childbirth, MCL 37.2201(d).  And second, it amended the ELCRA to expressly state that discrimination because of sex includes sexual harassment, MCL 37.2103(*i*).  Notably, it has not done so for sexual orientation.

[56] *LaGuire v Kain*, 440 Mich 367, 396-397 & n 21; 487 NW2d 389 (1992) (BOYLE, J., concurring in part), citing *People v Petrella*, 424 Mich 221, 243-244; 380 NW2d 11 (1985); *Miller*, 410 Mich at 567; *Gen Teamsters Union v Uptown Cleaners & Hatters, Inc*, 356 Mich 204, 240; 97 NW2d 593 (1959); *People v Adamowski*, 340 Mich 422, 429; 65 NW2d 753 (1954); and *Miles ex rel Kamferbeek v Fortney*, 223 Mich 552, 564; 194 NW 605 (1923).  See also *Wayne Co v Auditor General*, 250 Mich 227, 235-236; 229 NW 911 (1930) (in construing an act for the distribution of highway funds, this Court stated: "The legislative history of the 1927 act reveals the fact that while it was pending in the legislature, a proposed amendment was rejected which, if embodied in the act, would have rendered it subject to plaintiff's interpretation and not to that of the defendant.  Surely this gives rise to the inference that the legislature did not intend the act should be subject to the interpretation now urged by plaintiff") (citation omitted).

adopted."[57] And, "[w]here the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected."[58] The Supreme Court of the United States has held similarly, explaining that a congressional committee's deletion of a provision from a bill under consideration strongly militates against a judgment that Congress intended a result it had expressly declined to enact.[59] Relatedly, "[f]ew principles of statutory construction are more compelling than the proposition that [the Legislature] does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."[60]

As this Court has explained, the highest quality legislative history

include[s] actions of the Legislature intended to repudiate the judicial construction of a statute, see, e.g., *Detroit v Walker*, 445 Mich 682, 697; 520 NW2d 135 (1994), or *actions of the Legislature in considering various*

---

[57] *Miller*, 410 Mich at 566. Accord *Nation v W D E Electric Co*, 454 Mich 489, 497; 563 NW2d 233 (1997) ("In light of the Legislature's rejection of an explicit provision requiring compound interest, we presume the Legislature's silence evidences an intent that courts continue to use simple interest.").

[58] *In re MCI Telecom Complaint*, 460 Mich 396, 415; 596 NW2d 164 (1999), citing *Jennings v Southwood*, 446 Mich 125, 142; 521 NW2d 230 (1994). Accord *Bush v Shabahang*, 484 Mich 156, 173-174; 772 NW2d 272 (2009). See also *Univ Med Affiliates, PC v Wayne Co Executive*, 142 Mich App 135, 140; 369 NW2d 277 (1985) (holding that the legislative history of a statute may be considered, and if it can be shown that certain language was affirmatively rejected, a court should not give the statute a construction that the Legislature plainly refused to give it); *Elliott v Genesee Co*, 166 Mich App 11, 17; 419 NW2d 762 (1988).

[59] *Gulf Oil Corp v Copp Paving Co, Inc*, 419 US 186, 200; 95 S Ct 392; 42 L Ed 2d 378 (1974).

[60] *Immigration & Naturalization Serv v Cardoza-Fonseca*, 480 US 421, 442-443; 107 S Ct 1207; 94 L Ed 2d 434 (1987) (quotation marks and citation omitted).

*alternatives in language in statutory provisions before settling on the language actually enacted.* See, e.g., [*Miles ex rel Kamferbeek*, 223 Mich at 558]. From the former, a court may be able to draw reasonable inferences about the Legislature's intent, even when the Legislature has failed to unambiguously express that intent. *From the latter, by comparing alternative legislative drafts, a court may be able to discern the intended meaning for the language actually enacted.*[61]

These principles of statutory interpretation are dispositive for properly interpreting the ELCRA, and the majority opinion errs by ignoring them in favor of a myopic focus on an erroneous understanding of the original meaning of the ELCRA's text, taken without due consideration of the historical-linguistic context from which the phrase at issue arose.[62]

---

[61] *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003) (emphasis added). Just last year, this Court unanimously held that reviewing such statutory history is extremely valuable. See *Dep't of Talent & Economic Dev/Unemployment Ins Agency*, 507 Mich at 227 ("A statute's history—the narrative of the statutes repealed or amended by the statute under consideration—properly form[s] part of [its] context.") (quotation marks and citations omitted). See also *Bush*, 484 Mich at 173-174 ("[W]here the Legislature has considered certain language and rejected it in favor of other language, *the resulting statutory language should not be held to authorize what the Legislature explicitly rejected*.") (emphasis added; quotation marks and citation omitted).

For purposes of this dissent, there is no meaningful distinction between the kind of legislative history I am considering, on the one hand, and statutory history, on the other. Whatever labels we might apply to the Committee's consideration but ultimate rejection of including sexual orientation as a protected class in the ELCRA, there can be no doubt that we can—and indeed must, if we are faithfully to interpret the ELCRA consistently with the Legislature's intent—consider it.

[62] Justice VIVIANO persuasively demonstrates that the majority opinion's but-for causation test is inapplicable because the threshold requirement of discriminatory animus has not been met, and, in the alternative, even if the test is appropriate, the majority opinion misapplies it. To his thorough analysis, I would add the following. The majority opinion makes much ado about the role played by "because of" in its interpretation of the ELCRA. The majority opinion holds that "the operative phrase 'because of' in the ELCRA establishes a but-for causation standard," just as the Supreme Court of the United States held "because of" does in Title VII when it decided *Bostock. Ante* at 17. "[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have

24

My interpretation of the ELCRA is not a novel one. Neither the MCRC nor the MDCR, the institutional actors entrusted with enforcing the ELCRA and who have a natural, vested interest in pursuing more expansive, aggressive interpretations of it,[63]

---

found a but-for cause." *Bostock*, 590 US at ___; 140 S Ct at 1739. Thus, for the majority opinion, the ELCRA prohibits, and always has prohibited, sexual-orientation discrimination because "a person's sexual orientation necessarily implies conclusions about their sex, and so 'it is impossible to discriminate against a person' for their sexual orientation 'without discriminating against that individual based on sex.' " *Ante* at 21, quoting *Bostock*, 590 US at ___; 140 S Ct at 1741.

Ordinarily, that "because of" means but-for causation would not be terribly controversial; that is a reasonable, but not a necessary, construction of the phrase. See *Hrapkiewicz v Wayne State Univ Bd of Governors*, 501 Mich 1067, 1067, 1069 (2018) (MARKMAN, C.J., dissenting) (explaining that because this Court's caselaw has produced "inconsistent" interpretations of the ELCRA's causation standard, the Court should "grant leave to appeal to address whether the 'because of' language in MCL 37.2202(1)(a) [of the ELCRA] should be interpreted" as imposing but-for causation); *Price Waterhouse v Hopkins*, 490 US 228, 240; 109 S Ct 1775; 104 L Ed 2d 268 (1989) (plurality opinion; superseded by statute on other grounds) ("To construe the words 'because of' as colloquial shorthand for 'but-for causation' . . . is to misunderstand them.") (comma omitted). But, as discussed earlier, the ELCRA's prepassage history directs us to read "because of" consistently with the Legislature's intent not to include sexual orientation as a protected class under the ELCRA. That prepassage history limits the scope of "because of"—a limit that this Court must respect as an interpretive, not a legislative, body.

[63] See *Chadha*, 634 F2d at 422-423 (observing that the separation of powers' "goal of preventing undue concentrations of power is furthered by the natural tendency of each center of power [i.e., branch of government] to compete to enlarge or maintain its own influence" and that "[a]n undue concentration of authority in one branch inevitably causes structural decomposition of the other branches, along with a dispersion of their original powers"). See also The Federalist No. 51 (Madison) (Rossiter ed, 1961), pp 318-319 (explaining how to prevent each branch, which naturally "wants" to dominate its co-branches, from doing so: "But the great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. The provision for defense must in this, as in all other cases, be made commensurate to the danger of attack. Ambition must be made to counteract ambition. The interest of the man must be connected with the constitutional rights of the place").

understood the ELCRA to prohibit sexual-orientation discrimination until 2018. In 1977, the same year that the ELCRA became effective, the MCRC published a "Sexual Orientation Report and Recommendations."[64] In a 2013 report, the MCRC, discussing that 1977 report, stated that "[p]erhaps the most significant conclusion reached in [the 1977] report was the [MCRC's] statement that the [MDCR] would not handle sexual orientation discrimination cases. The [MCRC] cited a lack of jurisdiction until the State legislature specifically authorized such an addition to its powers under ELCRA."[65] In 1983, the MCRC issued a statement saying that the ELCRA should be amended to prohibit sexual-orientation discrimination.[66] And in 2013, the MCRC issued the aforementioned "Report on LGBT Inclusion Under Michigan Law with Recommendations for Action," which reaffirmed the MCRC's original, longstanding position, held since the ELCRA became effective in 1977, that the ELCRA does not prohibit sexual-orientation discrimination.[67]

---

[64] See Appendix to Plaintiffs-Appellees' Brief on Appeal at 83a (discussing that 1977 report).

[65] MDCR, *Report on LGBT Inclusion under Michigan Law with Recommendations for Action* (January 28, 2013), p 5, available at <https://www.michigan.gov/-/media/Project/Websites/mdcr/mcrc/reports/2013/lgbt-inclusion.pdf?rev=2f4b1e824be04de7b2d0bec9a607b6bf> (accessed July 24, 2022) [https://perma.cc/HL6P-S8NJ].

[66] *Id*.

[67] *Id*. at ii ("While ELCRA prohibits employment, public accommodations, public services, education, and housing discrimination based on race, religion, color, national origin, sex, age, marital status, height, weight, and arrest record, *it does not currently prohibit discrimination based on sexual orientation* or gender identity/expression.") (emphasis added).

While an agency's interpretation of a statute is, of course, not binding on us,[68] we should not treat it, as the majority opinion does, as though it is no evidence at all of a statute's meaning.[69] Defendants cannot admit that, for more than 40 years, the MCRC openly acknowledged that it did not understand "sex" to include sexual orientation,[70] and then in

---

[68] *In re Complaint of Rovas*, 482 Mich at 100 (stating that agencies cannot "assume this Court's constitutional role as the final arbiter of the meaning of a statute").

[69] See *id*. at 103, quoting *Boyer-Campbell Co v Fry*, 271 Mich 282, 296-297; 260 NW 165 (1935) (explaining this Court's approach to an agency's interpretation of a statute: " 'the construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, *the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature*' ") (emphasis added; alteration in *Rovas*).

[70] In addition to the actions of the MCRC, those of former Governor Jennifer Granholm are instructive because they demonstrate the widespread, commonsense understanding that discrimination based on sex is not the same as discrimination based on sexual orientation. As Governor Gretchen Whitmer stated in Executive Order No. 2019-09, "[d]iscrimination based on sexual orientation was prohibited in state employment for the first time by Executive Directive 2003-24." Former Governor Granholm promulgated Executive Directive No. 2003-24, which explicitly enumerates sexual orientation as a protected class. See *id*. (prohibiting discrimination "because of religion, race, color, national origin, age, sex, *sexual orientation*, height, weight, marital status, partisan considerations, or a disability or [certain] genetic information") (emphasis added). In 2004, "[t]his prohibition was incorporated by the Civil Service Commission in its Rule 1-8.1 on prohibited discrimination . . . ." EO 2019-09, citing Civ Serv R 1-8.1, p 5.

Executive Directive No. 2003-24 and Civil Service Rule 1-8.1 expressly added sexual orientation as a new, separately prohibited form of discrimination. In promulgating those executive actions, Governor Granholm's administration did not assert that language prohibiting discrimination "because of . . . sex" in prior executive actions "already banned, or henceforth would be deemed to ban, sexual orientation discrimination[.]" *Zarda*, 883 F3d at 152 n 22 (Lynch, J., dissenting). Instead, her administration deployed the phrase explicitly to accomplish her goal of prohibiting sexual-orientation discrimination in state employment. This shows that Michigan's executive branch, like our Legislature, has,

the same breath argue that it is suddenly plain and obvious that it does—indeed, that it always has.[71]

<hr>

consistently with my interpretation of the ELCRA, "long understood sexual orientation discrimination to be distinct from, and not a form of, sex discrimination." *Bostock*, 590 US at ___; 140 S Ct at 1831 (Kavanaugh, J., dissenting).

[71] Historically, Michigan legislators have been on the same page as defendants in their understanding that the ELCRA does not prohibit sexual-orientation discrimination. Since the ELCRA became effective in 1977, there have been numerous proposals to amend it to include sexual orientation. In 1980, just a few years after the ELCRA was enacted, Representative David Evans organized a statewide citizens' task force to discuss amending the ELCRA to include that language. See MDCR *Report on LGBT Inclusion* at 5. A few years after that, in 1983, Representative James Dressel introduced a bill—the "Dressel Amendment" (HB 5000)—to amend the ELCRA to include sexual orientation. See Lindstrom, *Remembering a Pioneering Moment in Gay Rights in the Legislature*, Gongwer (March 7, 2013) <https://www.gongwer.com/blog/?postid=6001> (accessed July 24, 2022) [https://perma.cc/D9NY-4GFC]. In 2005, Representative Chris Kolb introduced a bill to amend the ELCRA to prohibit both sexual-orientation and gender-identity discrimination. See Miller, *Once Promising, Kolb's LGBT Bills Fizzle*, The Michigan Daily (February 14, 2006) <https://www.michigandaily.com/uncategorized/once-promising-kolbs-lgbt-bills-fizzle/> (accessed July 24, 2022) [https://perma.cc/P926-8RH9]. A similar effort was made in 2014, when Representative Frank Foster introduced a bill that would have added sexual orientation to the ELCRA. See Oosting, *'Historic' Gay Rights Hearing Ends Without Vote on Michigan Anti-Discrimination Proposals*, MLive (December 3, 2014) <https://www.mlive.com/lansing-news/2014/12/historic_hearing_on_gay_rights.html> (accessed July 24, 2022) [https://perma.cc/L93S-BXGJ] (quoting Foster acknowledging that some states "already have this type of legislation, *some as far back as the 1970s*") (emphasis added). All told, since 1990, the Legislature has considered, and rejected, 22 bills that would have added sexual orientation to the ELCRA. See 2021 SB 208, 2021 HB 4297, 2019 SB 351, 2019 HB 4997, 2017 SB 424, 2017 HB 4689, 2015 SB 0315, 2015 HB 4538, 2014 SB 1053, 2014 HB 5959, 2014 HB 5804, 2012 SB 1063, 2009 HB 4192, 2007 HB 4160, 2005 SB 787, 2005 HB 4956, 2003 SB 609, 2003 HB 4850, 2001 HB 4661, 1999 HB 5107, 1992 HB 6222, and 1990 HB 5993.

While the majority opinion correctly notes that there are myriad reasons why legislators might have wanted to amend the ELCRA, we cannot and should not rule out the most obvious and straightforward explanation: as competent users of the English language, they fully believed that, as written, the ELCRA did not prohibit what they wanted it to prohibit, which is precisely why they tried to amend it. This postenactment history is not

Finally, by consulting the Corpus of Historical American English (the COHA),[72] we have strong evidence that the 1970s public understood that the ELCRA would prohibit sex discrimination—differential, negative treatment of members of one sex vis-à-vis members of the other sex[73]—not sexual-orientation discrimination. Availing ourselves of a relatively new tool of statutory interpretation, corpus linguistics,[74] and performing a search

---

dispositive as to the ELCRA's original public meaning, but it is certainly not, per the majority opinion's characterization, evidence that is hopelessly inscrutable.

Moreover, the public has not understood the ELCRA to prohibit sexual-orientation discrimination. In 2020, some Michiganders launched a ballot initiative that would have extended the ELCRA's protections to cover sexual orientation and gender identity. See Knoppow, *New Coalition Seeks to Amend ELCRA via Citizen Initiative*, PrideSource (January 16, 2020) <https://pridesource.com/article/new-organization-seeks-to-amend-elcra-via-citizen-initiative/> (accessed July 24, 2022) [https://perma.cc/R4C7-QWMQ]. This ballot-initiative effort failed. See *Fair & Equal Mich v Bd of State Canvassers*, 508 Mich 967 (2021) (denying the plaintiff's complaint for mandamus, sought in response to the Board of State Canvassers' unanimous conclusion that the plaintiff's petition to add sexual orientation and gender identity to the ELCRA did not garner sufficient signatures to be placed on the ballot). Even so, like the legislators who attempted to amend the ELCRA to include sexual orientation after it became law, the most obvious and straightforward explanation for why these citizens started a ballot initiative to amend the ELCRA is that they believed that the ELCRA did not prohibit what they wanted it to prohibit: sexual-orientation discrimination.

[72] The COHA is a database of nearly 406 million words and around 107,000 English texts—newspapers, popular magazines, fiction and nonfiction books—published between 1810 and 2009. See Alatrash et al, *CCOHA: Clean Corpus of Historical American English*, Proceedings of the 12th Conference on Language Resources and Evaluation (May 2020), pp 6958-6959, available at <https://aclanthology.org/2020.lrec-1.859.pdf> (accessed July 24, 2022) [https://perma.cc/XFR3-CQ6Z].

[73] See note 40 of this opinion (citing and discussing *Radtke*, 442 Mich at 379; *Diamond*, 265 Mich App at 683; *Oncale*, 523 US at 80, quoting *Harris*, 510 US at 25 (Ginsburg, J., concurring); *On the Basis of Identity*, 43 Harv J L Pub Policy at 390; *Weinberger*, 420 US at 654).

[74] This Court has used this method previously. See *Harris*, 499 Mich at 347-349.

29

for "sex discrimination"—which is what the ELCRA declares unlawful—we note that every single one of the 20 search results generated for the decade preceding the ELCRA's passage into law (i.e., 1966–1976) pertains to differential, negative treatment of persons in terms of gender. There are no references to sexual-orientation discrimination in any of those COHA search results. Not even a hint.

For these reasons, it is a clear violation of the Michigan Constitution's separation of powers for this Court to add by judicial fiat a category to the ELCRA that was specifically rejected by the enacting Legislature and understood for more than 40 years to not exist in the ELCRA by the governmental institutions principally charged with enforcing it, not to mention a former governor, numerous legislators, and informed members of the public.[75] Consequently, we should not read the ELCRA to accomplish something that it plainly and

---

[75] The majority opinion relies on *Oncale*, 523 US at 79, for its expansive reading of the ELCRA. But this reliance is misplaced. *Oncale* stated that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils" and that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id*. It is unremarkable that a statutory provision might cover circumstances that its enactors did not clearly foresee would arise or even ones that they did not specifically intend for it to cover. For example, given the social conditions of the historical moment in which the ELCRA was passed, most legislators probably thought that the ELCRA's prohibition on discrimination "because of . . . sex" would help (only) women, at least as a practical matter. But that does not change the reality that the reasonable import of the ELCRA's words also obviously applies to men, and we cannot limit their scope based on what legislators thought they were accomplishing because the plain and reasonable meaning of those words covers men as well as women. But that is not the case with sexual orientation. As I have been at pains to demonstrate, to discriminate based on sex as opposed sexual orientation "implicates two distinct societal concerns, reveals two distinct biases, imposes two distinct harms, and falls within two distinct statutory prohibitions." *Bostock*, 590 US at ___; 140 S Ct at 1835 (Kavanaugh, J., dissenting). Thus, the two forms of discrimination are not "reasonably comparable evils," *Oncale*, 523 US at 79, in the same way that discrimination based on sex—regardless of which sex it is perpetrated against—is.

30

indisputably would have accomplished had sexual orientation been expressly included in it, especially when we know that the Legislature knew how to achieve that goal if it had wanted to achieve it, given that it has done so in other statutes.[76]

That the Legislature considered adding sexual orientation to the ELCRA but ultimately chose not to do so materially distinguishes this case from *Bostock*, on which the majority opinion is patterned,[77] thereby requiring a different outcome. Unlike the 88th Congress (1963–1965) that passed Title VII, our Legislature, in its 78th legislative session (1975–1976), is known to have explicitly considered, but ultimately rejected, adding sexual orientation as a protected class under the ELCRA. Why it did not include sexual orientation, even if such information could be known with confidence, is irrelevant. When the Legislature "has considered certain language and rejected it in favor of other language, *the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected.*"[78] That is precisely the situation here. Thus, this Court should not read the ELCRA to cover something that the Legislature specifically and explicitly did not craft it to cover.[79] To hold otherwise runs afoul of the people's right to govern themselves through their elected representatives in the Legislature.

---

[76] See MCL 28.257a; MCL 141.1361(10)(a) and (b).

[77] See *ante* at 18 (stating that *Bostock* "offers a straightforward analysis of the plain meaning of analogous statutory language" and "agree[ing] with its reasoning"); see also *id*. at 18 n 12 (further defending its reliance on *Bostock*).

[78] *In re MCI Telecom Complaint*, 460 Mich at 415 (emphasis added).

[79] The majority opinion takes the position that because only a subset of the Legislature—the Committee, not a majority of the Legislature or the entire Legislature—made the choice to exclude sexual orientation as a protected class under the ELCRA, its exclusion by the Committee has no bearing on a proper interpretation of the ELCRA. This is incorrect. For

31

III. CONCLUSION

This Court's function is to interpret and apply the laws that the Legislature writes. That is not what the majority opinion has done. Instead, it analyzes the words of the ELCRA in a vacuum, stripped from their relevant and critical historical-linguistic context—context that is necessary to make them fully intelligible and to preserve Michiganders' right to self-government and the constitutional separation of powers. Seizing on the words of the ELCRA in isolation, the majority opinion is thereby able to

one thing, the 1975–1976 Legislature itself chose the committee system as its decision-making mechanism. We should not ignore that choice, especially when we have relied on less compelling evidence than we have here to inform our understanding of a statute's meaning. See *People v Arnold*, 502 Mich 438, 460-462, 468; 918 NW2d 164 (2018) (in deciding whether to construe the phrase "1 day to life" in MCL 750.335a(2)(c) as a mandatory or as an optional alternative, the Court looked to how the phrase was understood by the "Governor's Study Commission on the Deviated Criminal Sex Offender," which in 1949 was appointed by then Governor G. Mennen Williams to offer recommendations to amend the second Goodrich Act, 1939 PA 165, some of which the Legislature adopted).

Moreover, it is absurd to say that because only the Committee's eight members explicitly voted on whether to include sexual orientation in the ELCRA, we therefore cannot know what any other legislators thought of the phrase's resulting absence in the bill. The Committee is not hermetically sealed off from the rest of the Legislature; its members' actions are known to the other legislators. The Committee's decision not to include sexual orientation in the ELCRA, therefore, would have been common knowledge to the rest of the Legislature, whose members are competent users of the English language. For the reasons I have explained, the choice to exclude sexual orientation strongly militates against reading the ELCRA to cover it. See *LaGuire*, 440 Mich at 396-397 (BOYLE, J., concurring in part) ("[W]here the Legislature has affirmatively rejected language that would support an interpretation of a statute, that rejection evidences a legislative intent toward a contrary construction."); *id*. at 397 n 21 (collecting cases in support); *Miller*, 410 Mich at 566 (explaining that the Court is "aided in discovering legislative intent . . . by examining the proposed legislation [that the Legislature] considered and rejected, contrasted with the provisions as finally adopted"); *In re MCI Telecom Complaint*, 460 Mich at 415 ("Where the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected."). See also *Bush*, 484 Mich at 173-174; *Univ Med Affiliates, PC*, 142 Mich App at 140; *Elliott*, 166 Mich App at 17.

declare them to mean something that nobody for more than 40 years seriously believed that they meant. The best interpretation of the ELCRA, in light of the available evidence about its original public meaning, is that its prohibition on discrimination in public accommodations "because of . . . sex" does not encompass a prohibition on sexual-orientation discrimination. This is all the more obvious given that the Legislature specifically and explicitly considered including sexual orientation as a protected class under the ELCRA but ultimately did not. Though I take no issue with today's outcome, because I do not recognize the manner in which it has been achieved by the majority opinion to be faithful to the judicial role, I dissent.

Brian K. Zahra

# STATE OF MICHIGAN

## SUPREME COURT

ROUCH WORLD, LLC, and UPROOTED
ELECTROLYSIS, LLC,

Plaintiffs-Appellees,

v                                                                  No. 162482

DEPARTMENT OF CIVIL RIGHTS and
DIRECTOR OF THE DEPARTMENT OF
CIVIL RIGHTS,

Defendants-Appellants.

---

VIVIANO, J. (*dissenting*).

Justice ZAHRA's thorough dissent cogently explains why the original public meaning of "sex" when the Elliott-Larsen Civil Rights Act (the ELCRA), MCL 37.2101 *et seq*., was passed did not and could not encompass "sexual orientation." I agree with the conclusion he reaches. I write separately, however, to explain how the majority mangles another aspect of the ELCRA. The relevant statutory provision, MCL 37.2302(a), prohibits certain discriminatory actions taken "because of . . . sex," among other things. Properly interpreted, this requires that the defendant maintain some prejudice, bias, animus, or belief about "sex" or the other characteristics protected by the statute. In other words, when someone discriminates against another person "because of" that person's "sex," the discrimination results from a belief about or animus against that person's sex. Only once this threshold element is satisfied does one need to consider the degree to which that belief

or animus motivated the defendant, e.g., whether the discriminatory motive must be a but-for cause.

Here, that threshold is not satisfied: discrimination on the basis of one's sexual orientation is not discrimination because of some prejudice, bias, animus, or belief about the male sex or the female sex. Consequently, we need not decide whether to adopt a but-for standard. But even if that standard applied, the majority still reaches the wrong outcome. A proper application of the but-for test takes into account the defendant's motive. That means where, as here, no belief or animus about biological sex has been shown, "sex" cannot be a but-for cause of discriminatory actions. Accordingly, I dissent.

## I. THE TEXT REQUIRES A DISCRIMINATORY MOTIVE

The ELCRA's general provision states:

> The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right. [MCL 37.2102(1).]

Other sections more fully implement this provision. The section that Rouch World allegedly violated is MCL 37.2302:

> Except where permitted by law, a person shall not:
>
> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status.[1]

---

[1] Another section contains similar language against employer discrimination:

The relevant inquiry is whether an individual is subject to certain adverse actions "because of" his or her "sex." MCL 37.2302(a).

I believe that the majority's decision today, by myopically focusing on the term "because of," fails to adequately account for the original meaning of the full text of MCL 37.2302(a). The statute requires a link between the specified discriminatory actions and a specified protected class or characteristic. When the entire section is considered, it is clear that the connection must be the defendant's discriminatory motive or intent, i.e., he or she must take the discriminatory action because of some belief or animus with regard to the protected characteristic. The but-for test might still fit within this framework, explaining the degree to which the belief or animus must motivate the defendant. But it is unnecessary to decide whether the but-for test or some alternative standard (such as the motivating-factor test, discussed below) applies when a discriminatory motive or intent has not been

---

An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system. [MCL 37.2202(1).]

3

established.  Put differently, to run afoul of the statute, a defendant must have some belief or prejudice about the protected characteristic that prompts him or her to act.  Only then is it appropriate to ask how much of a role this motivation played in the action.

## A.  TEXTUAL ANALYSIS

The majority today eschews any focus on intent and, in doing so, departs from the ordinary meaning of the statute.  Following the lead of the United States Supreme Court, the majority here finally adopts the but-for gloss on "because of."  The centerpiece of this analysis comes from *Bostock v Clayton Co*, 590 US___, ___; 140 S Ct 1731, 1739; 207 L Ed 2d 218 (2020):

> And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' " *University of Tex. Southwestern Medical Center v. Nassar*, 570 U. S. 338, 350 [133 S Ct 2517; 186 L Ed 2d 503] (2013) (citing *Gross v. FBL Financial Services, Inc.*, 557 U. S. 167, 176 [129 S Ct 2343; 174 L Ed 2d 119] (2009); quotation altered). In the language of law, this means that Title VII's "because of" test incorporates the " 'simple' " and "traditional" standard of but-for causation. *Nassar*, 570 U. S., at 346, 360.  That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See *Gross*, 557 U. S., at 176.  In other words, a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause.

> This can be a sweeping standard.  Often, events have multiple but-for causes.  So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision.  Cf. *Burrage v. United States*, 571 U. S. 204, 211–212 [134 S Ct 881; 187 L Ed 2d 715] (2014).  When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision.  So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.  See *ibid.*; *Nassar*, 570 U. S. at 350.

4

The first term to consider in MCL 37.2302(a) is "because of." The dictionary definition of that term is "by reason of; on account of." *American Heritage Dictionary* (2d college ed, 1982), p 166. See also *Webster's New Collegiate Dictionary* (1976), p 98 (same); *The Random House Dictionary of the English Language: Second Unabridged Edition* (1987) (defining "because of" as "by reason of; due to"), p 184; *The Oxford English Dictionary* (2d ed, 1989), p 41 (defining "because of" as, relevantly, "[b]y reason *of*, on account *of*"). "Reason" is relevantly defined as "a basis or cause, as for some belief, action, fact, event, etc. . . ." *The Random House Dictionary of the English Language: Second Unabridged Edition* (1987). Thus, a person can be said to take an action "because of" sex when sex was a "cause" or "basis" of the person's act.

The words "cause" and "basis" do a lot of work here. "Cause" is defined as "the reason or motive for some human action[.]" *Id.* Put differently, it is "[a] fact, condition of matters, or consideration, moving a person to action; ground of action; reason for action, motive." *The Oxford English Dictionary* (2d ed, 1989). Thus, based purely on dictionary definitions, sex is a "cause" when it is the reason, motive, or intent behind the person's action—when it is the fact or consideration that leads a person to take an action. "Basis" is similarly defined as "the groundwork or first principle; that which supports; foundation . . . ." *Webster's New Twentieth Century Dictionary: Unabridged* (2d ed, 1977). Sex is the "basis" for an act, then, when it supports or provides a foundation for the act—thus, when the act is discriminatory, sex is the basis when the actor has a prejudice, bias, animus, or belief with regard to a person's sex.

That the motive or intent must constitute a prejudice, bias, or animus against the protected characteristic is readily apparent from the broader statutory context. Although

5

the ELCRA does not contain the phrase "discriminate against"—which is found in the federal counterpart, 42 USC 2000e-2(a)(1)—the requirement of discriminatory animus is inherent in MCL 37.2302(a).[2] Indeed, the general ELCRA provision, MCL 37.2102(1), expressly prohibits "discrimination because of" various protected characteristics. MCL 37.2302(a) effectuates this prohibition with regard to certain public accommodations. As noted, this provision states that a person shall not "[d]eny an individual the full and equal enjoyment of" certain services, goods, or accommodations. MCL 37.2302(a). To "discriminate" means "to make a distinction in favor of or against a person or thing on the basis of the group, class, or category to which the person or thing belongs rather than according to actual merit; show partiality[.]" *The Random House Dictionary of the English Language: Second Unabridged Edition* (1987), p 564. To deny someone access to the goods, services, or accommodations on the basis of his or her sex is obviously a form of discrimination, i.e., it is making a distinction against the person on the basis of the person's sex. Therefore, while MCL 37.2302(a) lacks the phrase "discriminate against," the statute's language means essentially the same thing but is stated more specifically with regard to how the discrimination would occur, i.e., the denial of the good, service, or accommodation.[3]

---

[2] The federal statute makes it unlawful to "discriminate against any individual with respect to [employment matters] . . . because of such individual's . . . sex[.]" 42 USC 2000e-2(a)(1).

[3] This conclusion is further supported by MCL 37.2103(i), which is part of the general definitions section applicable to all of ELCRA. That provision states, "[d]iscrimination because of sex includes sexual harassment . . . ." "Sexual harassment" is defined to include conduct that "substantially interfere[s] with an individual's . . . public accommodations or public services . . . ." MCL 37.2103(i)(*iii*). In this light, then, the definitional section,

6

Discrimination naturally requires a prejudice, bias, animus, or some belief about a protected class or characteristic. As one scholar has noted, the term "discriminate" is often used with "prejudice," demonstrating a semantic link between the two words. Phillips, *The Overlooked Textual Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript), p 5, available at <https://www.supremecourt.gov/opinions/URLs_Cited/OT2019/17-1618/17-1618-3.pdf> (accessed July 24, 2022). Dictionaries from the relevant period frequently defined "discriminate against" in a manner that "refers to mistreatment based on *prejudice directed at* members of a discrete *group*."[4] Thus, discrimination against a person "because of . . . sex," the scholar concluded, "refers only to adverse treatment that rests on *prejudice (or bias)—i.e., loose generalizations or other unfair beliefs, attitudes (indifference,*

---

MCL 37.2103(i), indicates that the actions prohibited by MCL 37.2302(a) constitute discrimination against a person.

[4] *Id*. at 5. As Phillips states:

> For instance, Funk & Wagnalls Standard College Dictionary (10th ed. 1963) defines *discriminate* as "[t]o act toward someone or something with partiality or prejudice: to *discriminate against* a minority; to discriminate in favor of one's friends." Likewise, Webster's New World Dictionary (1960), defines the relevant sense of *discriminate* as "to make distinctions in treatment; show partiality (*in favor of*) or prejudice (*against*)." The idea of prejudice or bias against members of a certain group is also present in dictionary definitions emphasizing that discrimination involves action based on someone's membership in a group "rather than according to actual merit." [*Id*. at 5-6, quoting *The Random House Dictionary* (1966–1973).]

Phillips further notes that *Webster's Third International Dictionary* (1961) defines "discriminate" as " 'to make a difference in treatment or favor *on a class or categorical basis in disregard of individual merit* ([discriminate] in favor of your friends) (habitually *[discriminate] against* a certain nationality).' " *Id*. at 6 n 19.

7

*discounting of interests, distaste, antipathy, etc.)—directed at some or all men, or at some or all women.*" *Id*. at 3.

Accordingly, the ELCRA focuses on the motives and beliefs of the defendant with regard to the characteristic at issue. The question in a sex-discrimination case, then, is "whether the defendant employer took a particular adverse employment action against a particular female employee because she is a woman or against a particular male employee because he is a man." *Hively v Ivy Tech Community College of Indiana*, 853 F3d 339, 365 (CA 7, 2017) (Sykes, J., dissenting).

## B. CASELAW

Our caselaw provides ample support for the conclusion that the ELCRA requires the defendant to maintain a discriminatory motive concerning the characteristics protected by the statute. This motive represents a prejudice, bias, animus, or belief concerning the characteristic itself or people with the characteristic. As this Court has observed, the ELCRA and similar statutes "are addressed to 'the prejudices and biases' one race, sex, or religion bears against another." *Boscaglia v Mich Bell Tel Co*, 420 Mich 308, 316; 362 NW2d 642 (1984) (citation omitted). We have similarly observed that the ELCRA "seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Miller v C A Muer Corp*, 420 Mich 355, 363; 362 NW2d 650 (1984).

These prejudices and biases are necessarily aimed at the protected characteristics and statuses listed in the statute. In holding that "[t]he clear, unambiguous language of [the ELCRA] protects status, not conduct," we have explained that the statute requires "evidence of discrimination based on one of the protected characteristics" or some "link

8

between the conduct [the plaintiff engaged in] and a protected status." *Veenstra v Washtenaw Country Club*, 466 Mich 155, 160, 165-166; 645 NW2d 643 (2002). Elaborating, we described the "direct function of the words 'because of' " as follows: the ELCRA "merely prohibits actions that are taken *with regard* to certain types of statuses, '*because of*' these characteristics. *It does not prohibit actions that are legitimately taken for any other reason*." *Id*. at 165 n 7 (some emphasis added). Thus, the statute proscribes discrimination that arises from prejudices or biases against one of the listed characteristics or statuses.

In keeping with this understanding, our caselaw has, until today, always stressed that the discriminatory action must be causally linked to the defendant's motives and intent. This is true even though we have—again, until today—never finally settled on a test for determining the degree to which those motives must explain (i.e., be causally related to) the discriminatory action. We have sometimes favored a but-for test and sometimes a motivating-factor test. See *Hrapkiewicz v Wayne State Univ Bd of Governors*, 501 Mich 1067, 1067-1069 (2018) (MARKMAN, C.J., dissenting) (discussing the caselaw).

It appears that our first case to mention the but-for standard was *Matras v Amoco Oil Co*, 424 Mich 675; 385 NW2d 586 (1986). That age-discrimination case was originally brought under the ELCRA's predecessor (which lacked a provision on sex discrimination), the Fair Employment Practices Act (FEPA), MCL 423.301 *et seq*.[5] As *Matras*

_____

[5] "The FEPA was repealed upon passage of the [ELCRA], 1976 PA 453, effective March 31, 1977[.]" *Dep't of Civil Rights ex rel Parks v Gen Motors Corp*, 93 Mich App 366; 287 NW2d 240 (1979).

9

demonstrates, we have long understood that discrimination cases require discriminatory motive:

> A jury can find that the discharge was "because of age" even if age was not the sole factor. As accurately expressed in the Michigan Standard Jury Instruction, "[age] does not have to be the only reason, or even the main reason, but it does have to be one of the reasons which made a difference in determining whether or not to [discharge] the plaintiff." *Another formulation would be that age is a determining factor when the unlawful adverse action would not have occurred without age discrimination.* Alternative expressions of the determining factor concept are "but for causation" or "causation in fact."

> *In the instant case, the question therefore becomes whether there was sufficient evidence, when the evidence and inferences therefrom are viewed in a light most favorable to Matras, for reasonable jurors to conclude that age discrimination was a determining factor in the decision to discharge him.* [*Matras*, 424 Mich at 682-683 (emphasis added; citations omitted; alterations in original).]

We offered varying formulations of the test—"made a difference," "determining factor," and "but-for causation"—but embedded in each was the notion that discriminatory motive is critical.

Other cases applying a but-for test likewise indicate that the defendants' motives are a key element. In *Radtke v Everett*, 442 Mich 368, 383-384; 501 NW2d 155 (1993), for example, the plaintiff alleged sexual "harassment on the basis of sex" when her employer allegedly held her down and tried to kiss her. The defendant argued that his conduct was not sexual but romantic. Rejecting this, we stated that "plaintiff need only show that 'but for the fact of her sex, she would not have been the object of harassment.'" *Id*. at 383 (citation omitted). In concluding that she had made this showing, we stated, "The overtures at issue were certainly inferentially sexually motivated: but for her womanhood, Everett would not have held plaintiff down and attempted to solicit romance,

10

if not sex, from her." *Id*. at 384. While this applies the but-for test, it shows that the test cannot be used without consideration of the defendant's motivation.

More recently, in *Hecht v Nat'l Heritage Academies, Inc*, we stated: "The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination. In our caselaw, we have interpreted the CRA to require ' "but for causation" or "causation in fact." ' We reaffirm that construction here." *Hecht*, 499 Mich 586, 606; 886 NW2d 135 (2016), quoting *Matras*, 424 Mich at 682 (citation omitted). As in *Radtke*, we seemed to understand the but-for test as a tool for measuring whether the discriminatory intent was a sufficient cause of the adverse employment action. Again, we stated, "The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht*, 499 Mich at 606, citing *Reeves v Sanderson Plumbing Prod, Inc*, 530 US 133, 153; 120 S Ct 2097; 147 L Ed 2d 105 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.").

Our cases have also indicated that the term "because of" in the ELCRA requires a showing that consideration of the protected characteristic was a motivating factor in the defendant's decision. In *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001), we explained that if direct evidence of the prohibited "bias" is produced, the case can proceed as in any other civil matter. "Direct evidence," we said, is " 'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' " *Id*. (citation omitted). If such evidence is unavailable, then a burden-shifting test applies, under which a rebuttable presumption arises if the

11

plaintiff presents a prima facie case of discrimination: "evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Id*. at 463. This raises a presumption of discrimination which can be rebutted by evidence of a legitimate, nondiscriminatory reason for its decision. *Id*. at 464. If this is shown, then the plaintiff must demonstrate the evidence could lead a reasonable trier of fact to believe that "discrimination was a motivating factor for the adverse action . . . ." *Id*. at 465 (quotation marks and citation omitted).[6]

The burden-shifting test demonstrates that discriminatory motives are at the heart of the analysis. The test is geared toward determining whether a discriminatory motivation prompted the challenged action. This, in turn, requires deciding whether any nondiscriminatory rationales were mere pretexts. Indeed, in *Hazle*, we went on to say that the "ultimate factual inquiry made by the jury[] [is] whether consideration of a protected characteristic was a motivating factor, namely, whether it *made a difference* in the contested employment decision." *Hazle*, 464 Mich at 466 (emphasis added).

---

[6] It is generally understood that the but-for test is more rigorous and requires a higher showing than the so-called "motivating factor" standard, in which "a plaintiff [can] prevail merely by showing that a protected trait like sex was a 'motivating factor' in a defendant's challenged employment practice. . . . Under this more forgiving standard, liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision." *Bostock*, 590 US at ___; 140 S Ct at 1739-1740; see also *Hrapkiewicz*, 501 Mich at 1068 (MARKMAN, C.J., dissenting) (stating that the but-for test "imposes a considerably higher causation standard than" the motivating-factor test).

Likewise, in *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 134-135; 666 NW2d 186 (2003), we confirmed that discriminatory intent must be shown:

> Under either the direct evidence test or the [burden-shifting] test, a plaintiff must establish a causal link between the discriminatory animus and the adverse employment decision. . . . Under the direct evidence test, a plaintiff must present direct proof that the discriminatory animus was causally related to the adverse employment decision.

The opinion plainly refers to the central requirement of "discriminatory animus" that must be causally related to the discriminatory act. *Id*.

Consequently, although our Court has used both the motivating-factor and but-for tests, we have always treated the defendant's intent or motivation as the lodestar of the analysis. See *Lytle v Malady*, 456 Mich 1, 33; 566 NW2d 582 (1997) ("The bottom line is that there must always be evidence upon which reasonable minds could conclude that discrimination was the true motive for the decision."), vacated in part on other grounds 458 Mich 153 (1998); *Town v Mich Bell Tel Co*, 455 Mich 688, 704; 568 NW2d 64 (1997) (" '[T]he factual dispute at issue [in a sex-discrimination action] is whether discriminatory animus motivated the employer . . . .' ") (citation omitted). That is, we have always looked to what actually motivated the defendant in taking a discriminatory action. And we have likewise indicated that the statute covers discrimination based on prejudice, bias, animus, or beliefs about a certain characteristic.

Others, including the United States Supreme Court, have endorsed this view in cases addressing similar statutory language.[7] Although the Supreme Court in *Gross*, 557 US at

---

[7] Federal precedent "may often be useful as guidance in this Court's interpretation of laws with federal analogues . . . ." *Garg v Macomb Co Comm Mental Health Servs*, 472 Mich

13

176, indicated that the phrase "because of" entailed a but-for analysis, it also went on to express its statutory interpretation in the language of the dictionary, stating that "the ordinary meaning of the [Age Discrimination in Employment Act's] requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." Elsewhere, the Supreme Court relied on this portion of *Gross* to conclude "that Title VII retaliation claims require proof that the *desire* to retaliate was the but-for cause of the challenged employment action." *Nassar*, 570 US at 352 (emphasis added). In other words, in the context of an anti-retaliation provision of Title VII, the Court focused on the defendant's desire or intent. See generally Epstein, *Forbidden Grounds: The Case Against Employment Discrimination Laws* (Cambridge: Harvard University Press, 1995), p 160 (noting that in disparate treatment cases, the issue is whether "the defendant's conduct was actuated by some illegitimate motive").

Justice Alito has also taken this approach. See *Texas Dep't of Housing & Community Affairs v Inclusive Communities Project, Inc*, 576 US 519, 560; 135 S Ct 2507; 192 L Ed 2d 514 (2015) (Alito, J., dissenting). "What 'because of' means is no mystery," Justice Alito wrote, pointing to *Gross*'s use of the ordinary dictionary definition. *Id*. "Nor is this understanding of 'because of' an arcane feature of legal usage. When English speakers say that someone did something "because of" a factor, what they mean is that the factor was a reason for what was done." *Id*. "Put another way, 'the terms [after] the "because of" clauses in the [Fair Housing Act (FHA)] supply the prohibited motivations for the intentional acts . . . that the Act makes unlawful.' " *Id*. at 561 (citation omitted).

_____

263, 283; 696 NW2d 646 (2005), amended 473 Mich 1205 (2005). But "federal precedent remains only as persuasive as the quality of its analysis." *Id*.

14

Thus, "[u]nder a statute like the FHA that prohibits actions taken 'because of' protected characteristics, intent makes all the difference." *Id*. at 561-562.

In a similar context, the Supreme Court has further described how discrimination operates with regard to the relationship between intent and a protected characteristic. In *Bray v Alexandria Women's Health Clinic*, 506 US 263; 113 S Ct 753; 122 L Ed 2d 34 (1993), the Court examined 42 USC 1985(3), which prohibits private conspiracies that "depriv[e] . . . any person or class of persons of the equal protection of the laws . . . ." This language, the Court explained, required showing (among other things) "that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action' . . . ." *Bray*, 506 US at 268, quoting *Griffin v Breckenridge*, 403 US 88, 102; 91 S Ct 1790; 29 L Ed 2d 338 (1971). The prohibition centered on " 'invidiously discriminatory motivation . . . .' " *Bray*, 506 US at 268, quoting *Griffin*, 403 US at 102. The question in *Bray* was whether this statute "provide[d] a federal cause of action against persons obstructing access to abortion clinics." *Bray*, 506 US at 266.

The Court first rejected the argument that the relevant "class" was "women seeking abortion," as such a group merely consisted of individuals desiring to engage in certain conduct. *Id*. at 269. The more central argument in favor of finding a cause of action was that efforts to prevent women from accessing abortion clinics amounted to class-based discrimination against "women in general." *Id*. The Court acknowledged that the "animus" requirement was not limited to behavior that constituted "maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination against women." *Id*. at 270. In other words, the animus (or prejudice or bias) did not have to be malicious, but it did need to be invidious. Moreover, and critically, the motivation had to

15

center on the protected characteristic itself. Discriminatory animus "does demand . . . at least a purpose that focuses upon women *by reason of their sex*—for example (to use an illustration of assertedly benign discrimination), the purpose of 'saving' women *because they are women* from a combative, aggressive profession such as the practice of law." *Id*.

In *Bray*, there was no record evidence that the defendants had such an intent. *Id*. The Court thus went on to analyze the only other theories under which defendants might still be liable: (1) if opposition to abortion necessarily evinced a sex-based intent, or (2) "intent is irrelevant, and a class-based animus can be determined solely by effect." *Id*. Both theories were wrong. Perhaps, the Court acknowledged, opposition to some activities would be so irrational that it could only be explained by the fact that the activity "happen[s] to be engaged in exclusively or predominantly by a particular class of people . . . ." *Id*. In such circumstances, "an intent to disfavor that class can readily be presumed." *Id*. But opposition to abortion claimed "common and respectable reasons" aside from hatred or condescension toward women as a class. *Id*. With regard to the need for intent, rather than simply effects, the Court noted that " ' "[d]iscriminatory purpose" . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.' " *Id*. at 271-272, quoting *Personnel Administrator of Massachusetts v Feeney*, 442 US 256, 279; 99 S Ct 2282; 60 L Ed 2d 870 (1979). Opposition to abortion, therefore, was not "*ipso facto* sex discrimination." *Bray*, 506 US at 273.

*Bray* demonstrates that discrimination "because of" of a characteristic requires some prejudice, bias, animus, or belief about the protected characteristic. A belief about some other characteristic or conduct—like opposition to a particular sexual orientation—does

16

not suffice. Even if only women engage in some conduct, opposition to that conduct does not necessarily stem from some belief about the female sex. The mere effect on individuals in a protected status is not enough without discriminatory intent related to that status. This is simply how discrimination works. "Discrimination against persons . . . is necessarily oriented toward them based on their membership in a certain type of social group." Stanford Encyclopedia of Philosophy, *Discrimination* (April 2020), § 1.1 <https://plato.stanford.edu/entries/discrimination/> (accessed July 24, 2022) [https://perma.cc/YK2Q-J3WE]. Put differently, discrimination relates to the protected characteristic rather than some other characteristic or conduct that is sometimes associated with the protected characteristic.

Thus, the ordinary meaning of MCL 37.2302, focusing on the defendant's motivations, captures this commonsense view of discrimination. As two scholars recently wrote of the nearly identical language in Title VII, "The statute proscribes employer conduct based on the reasons that caused or explained the conduct (i.e., based on the employer's motivation), and not on other non-reason-based cases." Berman & Krishnamurthi, Bostock *Was Bogus: Textualism, Pluralism, and Title VII*, 97 Notre Dame L Rev 67, 99 (2021). It is true that, in some contexts, "because of" can mean something other than "motivated by." *Id*. at 100 n 166, citing Zatz, *The Many Meanings of "Because Of": A Comment on* Inclusive Communities Project, 68 Stan L Rev Online 68, 75 (2015) (a brief comment arguing that motivation is not always necessary to the causal concepts embedded in the term "because of"). But the scholars note that the other meanings are motivated by nontextualist purposes, and they contend that "the communicative content of 'because of' in relevantly similar utterances [to that in Title VII]—say, contexts concerning

17

the wrongfulness or permissibility of acts undertaken by an agent—is most often motivational, making the motivational reading the statute's 'ordinary meaning.' " *Id.*

## C.  MOTIVE CANNOT BE REMOVED FROM THE ANALYSIS

When motive is removed from the equation, causal statements about discrimination make little sense.  An example shows how this is true:

> Suppose Libby intends to dine one evening at Riley's Restaurant.  En route to Riley's, Libby, a member of the local Libertarian Party, stops at the Party's office for a short organizational meeting.  When arriving at Riley's, Libby is chagrined to learn that the restaurant's last table was taken minutes earlier and that it will be accommodating no more diners that evening.  Libby's political affiliation was a but-for cause of Riley's declining to serve Libby: if Libby hadn't been a member of the Libertarian Party, they'd have arrived at Riley's ten minutes earlier, in plenty of time to secure the last table.  But Riley's did not decline to serve Libby "because of" Libby's political affiliation: that Libby is a Libertarian was unknown to Riley's or any of its agents and was no part of its decisional calculus.  Were Libby to sue Riley's, alleging forbidden political-affiliation discrimination, they'd be laughed out of court (twice over).  The example generalizes: a fact or event can be a "but-for cause" of some agent's doing something without it being the case that the agent did that thing "because of" that fact or event.  (Here, to repeat, Libby's Libertarianism might have been a but-for cause of Riley's not seating them, without it being the case that Riley didn't seat Libby "because of" Libby's Libertarianism.)  To gloss the statutory phrase "because of" X to mean "by reason of" or "on account of" is to affirm this critical point.  [Bostock *Was Bogus*, 97 Notre Dame L Rev at 99-100.]

One of the main problems in this example is that Libby's libertarianism is not sufficient to explain the result.  That is, the fact that Libby is a Libertarian cannot adequately explain why the restaurant declined to serve her—there are other more immediate factors that fully explain the result, none of which involves any discriminatory motive.  No one would say that the restaurant denied Libby public accommodations because of her partisan affiliation.  The restaurant does not appear to care about that at all.

18

In a like manner, defendants who refuse accommodations or employment to someone "because of" that person's sexual orientation do not necessarily care about that person's biological sex. In fact, as in the restaurant example, such defendants need not even know the person's biological sex. See *Bostock*, 590 US at ___; 140 S Ct at 1758 (Alito, J., dissenting) ("Contrary to the Court's contention, discrimination because of sexual orientation or gender identity does not in and of itself entail discrimination because of sex. We can see this because it is quite possible for an employer to discriminate on those grounds without taking the sex of an individual applicant or employee into account. An employer can have a policy that says: "We do not hire gays, lesbians, or transgender individuals." And an employer can implement this policy without paying any attention to or even knowing the biological sex of gay, lesbian, and transgender applicants."). How can a defendant discriminate against a man *because* he is a man—or a woman *because* she is a woman—without knowing that the target of the discrimination is actually a man? Such a conclusion can be reached only if the threshold requirement for discriminatory motive or intent is thrown out the window. Because otherwise, in these circumstances, the defendants cannot possibly be acting out of an animus against or any belief about the male (or female) biological sex.

In response to this observation, the majority appears to accept the proposition that sexual orientation is so innately tied to biological sex that one cannot discriminate against the former without also discriminating against the latter. The gist of the contention appears to be that "[i]f a putative non-protected basis for discrimination conceptually depends on the protected characteristics of the plaintiff, then the basis for discrimination is 'because of' the relevant protected category as a matter of ordinary language." Bostock *Was Bogus*,

19

97 Notre Dame L Rev at 88 (quotation marks and citation omitted).  Justice ZAHRA fully reveals the fallacy of this argument.[8]  I would add that the argument is also incorrect because, without the requirement of discriminatory motive regarding a protected characteristic, this mode of analysis is hopelessly reductive.  Consider the following example:

> Suppose A shoots B, a police officer, out of anti-police animus.  In this case, competent English speakers would agree that "A shot B because B is a police officer."  Plausibly if roughly, a police officer is a person whose job is to enforce the law, including by investigating crimes and making arrests.  But even if the concept of police officer depends upon and incorporates the concept of a person, competent English speakers would firmly deny that "A shot B because B is a person."  [*Id.*]

One cannot be a police officer without being a person, yet no one believes that the shooter targeted the officer because he or she was a person.  This is because the shooter had no general animus against people—the animus was against police officers.  These are different

---

[8] As Justice ZAHRA has also ably demonstrated, no one at the time the ELCRA was passed understood the meaning of the term "sex" to encompass sexual orientation.  Further proof of this is that, when the ELCRA was enacted, Michigan had a statute on the books criminalizing sodomy.  MCL 750.158.  When the ELCRA passed in 1976, SCOTUS had not yet rendered unconstitutional laws that made it a crime for same-sex couples to engage in sodomy.  See *Lawrence v Texas*, 539 US 558; 123 S Ct 2472; 156 L Ed 2d 508 (2003).  Thus, if defendant is correct here, that would mean that when the ELCRA passed, a reasonable reader would have known that it prohibited discrimination against same-sex couples despite the fact that it was then a crime for those same-sex couples to have sexual relations.  That cannot be correct.  "When the meaning of a term is questionable, . . . courts should 'construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law.' . . .  This is 'because it is our role to make sense rather than nonsense out of the *corpus juris*.' " *In re Certified Questions from the US Dist Court, Western Dist of Mich*, 506 Mich 332, 404; 958 NW2d 1 (2020) (VIVIANO, J., concurring in part, dissenting in part), quoting *West Virginia Univ Hosps, Inc v Casey*, 499 US 83, 100-101; 111 S Ct 1138; 113 L Ed 2d 68 (1991), superseded by statute on other grounds.  In light of this broader legal context, it is nonsensical to believe that the public understood the ELCRA to protect sexual orientation.

things, just as an animus against a certain sexual orientation is not the same thing as an animus against a particular sex.[9]

All this shows that without some anchoring in a discriminatory motive that is linked to a protected characteristic, the but-for test fails to place any meaningful limitations on the analysis. But-for causation (also known as counterfactual causation) is transitive, such that it can stretch back to the big bang: "if [event] *e* counterfactually depends on *d* (so *d* causes *e*), and *d* counterfactually depends on *c* (so *c* caused *d*), then *c* causes *e*. This means that the number of causes for any given event *e* is staggeringly large, in each case reaching back to the big bang that apparently began this whole show." Moore, *For What Must We Pay? Causation and Counterfactual Baselines*, 40 San Diego L Rev 1181, 1220 (2003). One might say in all seriousness, "But for the big bang, I would not have spilled this pasta sauce on my shirt." But no one would say that I spilled the sauce "because of" the big bang.[10]

---

[9] Professor Cass Sunstein also explains it well:

> [I]magine if an English speaker, now or in 1964, says the following: "I am opposed to discrimination because of sex. I am also opposed to discrimination because of sexual orientation." Does the speaker not understand the English language? Is she being redundant? (The answer to both questions is "no.") Or suppose that an English speaker, now or in 1964, says the following: "I am opposed to discrimination because of sex. But I am *not* opposed to discrimination because of sexual orientation." Is the speaker contradicting himself? Is he making some sort of logical error? Does he not understand the language? (The answer to all three questions is "no.") [Sunstein, *Textualism and the Duck-Rabbit Illusion*, 11 Cal L Rev Online 463, 475 (2020).]

[10] Despite the fact that this Court has stated that the "ultimate question" in discrimination cases is whether "*intentional* discrimination" has occurred, *Hecht*, 499 Mich at 606 (emphasis added), the majority now declines to decide whether intent has anything to do with an ELCRA claim. The notion that intent could be disregarded in a disparate treatment claim—which is the type of claim at issue in the underlying proceeding—represents a fundamental misunderstanding of discrimination law. As I have discussed at some length,

D.  CONCLUSION AND RESPONSIVE ARGUMENTS

Consequently, I believe that, regardless of whether MCL 37.2302 involves a but-for causation test, there is a threshold requirement that the majority ignores: discriminatory motive or intent.  The statute applies only if the defendant takes a prohibited action as a result of a prejudice, bias, animus, or belief with regard to the particular protected characteristic.  For example, a man is discriminated against "because of" his sex if the

---

our cases have long held that disparate treatment claims require proof of discriminatory motive or intent.  See generally *Forbidden Grounds*, p 160.

There is another theory that permits discrimination claims based on effects alone: disparate impact.  These claims "allow courts to infer unlawful discrimination, wholly without evidence of improper motive, and solely from the (perceived) disparate consequences" of the challenged action.  *Id*.  As one scholar has noted, "the disparate impact theory begins where intentional discrimination ends . . . ."  See Selmi, *Was the Disparate Impact Theory a Mistake?*, 53 UCLA L Rev 701, 706 (2006).  Disparate impact "has always been contrasted with racial animus and motive, and despite the familiar refrains regarding how discrimination has become more subtle over time, we continue to define intentional discrimination in the context of animus and consciously impermissible motives."  *Id*.  Unsurprisingly, this theory is controversial, arguably resting on the assumption either that any disparity in outcome results from discrimination (even if from past practices long discarded) or that the focus on outcomes is necessary to "correct for imbalances that do not result from any unlawful conduct . . . ."  *Inclusive Communities Project, Inc*, 576 US at 555 (Thomas, J., dissenting).  It is not apparent that we have ever embraced this theory in circumstances like the present.  Regardless, the sort of claim at issue here involves disparate treatment, which requires discriminatory intent.  Yet the majority has decoupled intent from the statute.  In some ways this is more radical, even, than a disparate impact theory, which at least requires what it says—a disparate impact upon a protected class.  See *Int'l Brotherhood of Teamsters v United States*, 431 US 324, 336 n 15; 97 S Ct 1843; 52 L Ed 2d 396 (1977) (noting that disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity").  Here, there is no such discernable disparate impact on males as a class or females as a class.

22

defendant acted because of the defendant's bias, prejudice, animus, or belief with regard to men.[11]

My interpretation does not disturb the potential application of the ELCRA to interracial marriage or sex stereotypes. One argument that has been put forward to justify the result reached by the majority is that any other view of the statute would preclude the ELCRA from prohibiting discriminatory actions because of interracial marriage. Amicus American Civil Liberties Union (ACLU) says that an employer would violate the ELCRA by discriminating against employees in interracial marriages because such discrimination would be "because of . . . race." This is true, the ACLU states, even though such a policy applies equally to all races (just as a policy against homosexuals applies to members of

---

[11] It might be contended that by focusing on a defendant's view of a particular group, this interpretation unduly focuses on a defendant's treatment of groups rather than individuals, whereas the statute protects individuals. The Supreme Court in *Bostock*, 590 US at ___; 140 S Ct at 1740, made such an argument, noting that the statute focused on the defendant's treatment of the individual plaintiff rather than its treatment of a group of which the plaintiff is a member. Thus, according to *Bostock*, it is no defense for an employer who "fires a woman for refusing his sexual advances" that "while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall." *Id*. at ___; 140 S Ct at 1741. This is true, but irrelevant. In the example, the employer made the sexual advances on the employee *because* she was a women and the employer is sexually attracted to women. See Semeraro, *We're All Originalists Now . . . Or Are We?:* Bostock's *Misperceived Quest To Distinguish Title VII's Meaning from the Public's Expectations*, 49 Hofstra L Rev 377, 407 (2021) ("[F]inding a heterosexual man's romantic advances unwelcome . . . [is] only [a] problem[] to the employer if the employee is a woman."). "Nor is it a defense," *Bostock* stated, for an employer to say it discriminates against both men and women because of sex." *Bostock*, 590 US at ___; 140 S Ct at 1741. Again, this is true but irrelevant. If the employer is misanthropic and hates women for being women and men for being men—or perhaps is attracted to both men and women and makes sexual advances to both—then his actions are taken on the basis of prejudices or biases about individuals based on their protected traits (shared by groups).

23

both sexes). See also *Bostock*, 590 US at ___; 140 S Ct at 1765 (Alito, J., dissenting) (noting the argument: "So if an employer is happy to employ whites and blacks but will not employ any employee in an interracial relationship, how can it be said that the employer is discriminating against either whites or blacks 'because of such individual's race'? This employer would be applying the same rule to all its employees regardless of their race."). One immediate distinction between the present case and interracial marriage, however, is the historical roots of the latter: "[H]istory tells us," Justice Alito observed, that discrimination on the basis of an interracial relationship "is a core form of race discrimination." *Id*.

Under my interpretation, the distinction between the two cases goes deeper. The motivation in each situation is different. In the interracial-marriage context, the motivation "has nothing to do with marriage, and everything to do with race: racism and white supremacy. But opposition to same-sex marriage has nothing to do with sexism or male (or female) supremacy." Anderson, *On the Basis of Identity: Redefining "Sex" in Civil Rights Law and Faulty Accounts of "Discrimination"*, 43 Harv J L & Pub Pol'y 387, 416-417 (2020). Any animus against same-sex relationships does not similarly flow to one sex or the other. See *Hively*, 853 F3d at 368 (Sykes, J., dissenting) ("[M]iscegenation laws are inherently racist. They are premised on invidious ideas about white superiority and use racial classifications toward the end of racial purity and white supremacy. Sexual-orientation discrimination, on the other hand, is not inherently *sexist*. No one argues that sexual-orientation discrimination aims to promote or perpetuate the supremacy of one sex."); cf. Anderson, *Disagreement Is Not Always Discrimination: On* Masterpiece Cakeshop *and the Analogy to Interracial Marriage*, 16 Geo J Law & Pub Pol'y 123, 124

24

(2018) (rejecting the argument that individuals holding the view that marriage should be between one man and one woman are motivated by animus rather than "traditions [that] teach that there is a distinct value in the one-flesh union that only man and woman can form, and in the kinship ties that such union offers children").

In addition, my interpretation would not have any effect on the potential applicability of the ELCRA to sex stereotypes.[12] The ACLU argues here that discrimination on the basis of sexual orientation amounts to sex stereotyping because it punishes an individual for failing to conform to sex-based expectations about his or her behavior. Justice Alito responded to this very argument in his *Bostock* dissent, noting that perhaps in some cases there are traits associated with homosexuals (that would be tolerated or welcomed in a member of the opposite sex) that lead to discrimination. *Bostock*, 590 US at ___; 140 S Ct at 1764 (Alito, J., dissenting). That is not the case where the discrimination stems directly from sexual orientation itself, rather than from traits associated with that orientation. When defendants discriminate on the basis of sexual orientation, they are not discriminating based on a trait solely related to men or to women. Thus, a policy based on sexual orientation does not have a discernable effect on or aim against one biological sex over the other. Neither sex is being "exposed to" adverse actions "to which members of the other sex are not exposed." *Harris v Forklift Sys, Inc*, 510 US 17, 25; 114 S Ct 367; 126 L Ed 2d 295 (1993) (Ginsburg, J., concurring) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to

---

[12] I do not mean to take any position on whether the ELCRA otherwise covers stereotyping claims—my intent is only to show that such claims would not be precluded by my interpretation of "because of."

25

disadvantageous terms or conditions of employment to which members of the other sex are not exposed.").

Consider, too, that if the ACLU's argument is correct, it is hard to see how discrimination against heterosexuals would be covered by the statute. The United States Court of Appeals for the Seventh Circuit has stated, "Viewed through the lens of the gender non-conformity line of cases, Hively [the plaintiff] represents the ultimate case of failure to conform to the female stereotype (at least as understood in a place such as modern America, which views heterosexuality as the norm and other forms of sexuality as exceptional): she is not heterosexual." *Hively*, 853 F3d at 346. If *Hively*'s logic is correct, what happens if a homosexual employer fires an employee for being heterosexual and not homosexual? If heterosexuality is a stereotype of men and women, then homosexuality is not—as a result, discrimination against an employee for not being homosexual (i.e., for being heterosexual) would not punish that employee for failing to adhere to sex stereotypes. The ELCRA would therefore protect discrimination "because of" sexual orientation only in favor of homosexuality.

Accordingly, MCL 37.2302(a) does not prohibit discrimination "because of" sexual orientation. Such discrimination is not encompassed by the statute's prohibition of sex discrimination. Applying this interpretation in cases like the present is simple.[13] No one

---

[13] To be sure, questions of motivation and belief are not always easily adjudicated. In cases where there is a dual motive, determining which motive predominated can prove challenging. See *Forbidden Grounds*, pp 169-170. Cases like the present, by contrast, generally present a clear picture of motive: an individual was discriminated against because of the defendant's prejudice, bias, or animus related to sexual orientation. There is generally no evidence the defendant had any such beliefs regarding either the male or the female sex.

contends that plaintiffs here are motivated by any prejudice, bias, or animus against, or belief about, men qua men or women qua women. They are not accused of misogyny or misandry. Instead, they hold certain views—prejudices, biases, anima, or beliefs—concerning homosexuality. These beliefs—and not anything related to a view on biological sex—are at the center of their policies. The statute simply does not extend this far.

## II. THE MAJORITY MISAPPLIES THE BUT-FOR TEST

By reading the motive requirement out of the statute, the majority sets itself up for failure in applying the but-for test. This is because the factual scenarios the majority compares under that test lack the fact most critical to plaintiffs' mind in the present case: sexual orientation. Without that fact in the analysis, the majority is able to reach the result it desires. But to do so, the majority must ignore the statutory requirements explained above and, indeed, common sense about what it means to discriminate against a person based on a protected characteristic.

As the Supreme Court has explained, "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock*, 590 US at ___; 140 S Ct at 1739. As one scholar has argued, "counterfactuals by their nature are difficult to prove with any degree of certainty, for they require the fact-finder to speculate what would have happened if the defendant had not done what he did." See Moore, *Causation and Responsibility: An Essay in Law, Morals, and Metaphysics* (New York: Oxford University Press, 2009), p 84.[14] To reduce the uncertainties inherent

---

[14] He provides a useful example of this uncertainty:

27

in the analysis, the hypothetical world must be the one "most similar to ours . . . ."  Pearl & Mackenzie, *The Book of Why: The New Science of Cause and Effect* (New York: Basic Books, 2018), p 104 (on the science of causation); Robertson, *Metaphysical Truth vs. Workable Tort Law: Adverse Ambitions?*, 88 Tex L Rev 1053, 1061 (2010) ("Traditional tort law has an accepted answer to [Moore's criticism from *Causation and Responsibility*], one that blunts [Moore's] 'indeterminacy' criticism.  The imagined counterfactual world must be the same as the actual world as shown by the evidence in the case in all respects save one: the defendant's wrongful conduct must be corrected to the extent necessary to make the conduct acceptable under plaintiff's theory of the case.").  The "imagined correction of the defendant's conduct is the only allowable change, and this change must be done in an intellectually conservative way, employing as little creativity as possible." *Metaphysical Truth*, 88 Tex L Rev at 1061.

---

Suppose a defendant culpably destroys a life-preserver on a sea-going tug.  When a crewman falls overboard and drowns, was a necessary condition of his death the act of the defendant in destroying the life-preserver?  If the life-preserver had been there, would [the life have been saved]? . . . .

. . . [There is] an indeterminacy of meaning in the [but-for] test . . . .  There is a great vagueness in counterfactual judgments.  The vagueness lies in specifying the possible world in which we are to test the counterfactual.  When we say "but for the defendant's act of destroying the life-preserver" what world are we imagining?  We know we are to eliminate the defendant's act, but what are we to replace it with: a life-preserver that was alternatively destroyed by the heavy seas; a defendant who did not destroy the life-preserver because he had already pushed the victim overboard when no one else was around to throw the life-preserver to the victim; etc, etc?  [*Id*. at 84-85.]

On these terms, which the majority appears to adopt, the test is not met here. The core analysis underlying the majority's reasoning comes from an example offered in *Bostock*:

> [I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex. Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. [*Bostock*, 590 US at ___; 140 S Ct at 1741.]

But the but-for test allows changing only one aspect of the real world to create the counterfactual world. And, according to the example, there are only two relevant facts: in the real world the employee is (1) a man, and (2) attracted to men, whereas the comparator (i.e., the counterfactual example) employee is (1) a woman, and (2) attracted to men.

Here is the problem: "This is screamingly false to the facts as stipulated: *to the employer's mind*, the two employees are *not* materially identical in all respects except that one is a man and the other a woman; they are also non-identical in the respect that one is gay and the other straight." Bostock *was Bogus*, 97 Notre Dame L Rev at 106. That fact—the sexual orientation—is dropped out completely from the example despite its being, by all evidence and stipulation, the critical distinction that motivated the employer. In other words, the hypothetical does not "hold[] *everything* constant except the plaintiff's sex" because it also changes the plaintiff's sexual orientation. *Hively*, 853 F3d at 366 (Sykes, J., dissenting) (emphasis altered).

29

Consequently, in the real world and under the statute (as properly interpreted), there are three relevant facts: "the employee is (1) a man, (2) attracted to men, and (3) gay. The comparator is (1) a woman, (2) attracted to men, and (3) *heterosexual*." Krishnamurthi, *Not the Standard You're Looking For: But-For Causation in Anti-Discrimination Law*, 108 Va L Rev Online 1, 7 (2022). The majority's but-for analysis changes *two* of these facts, not just one.[15] A woman who is attracted to men is straight. True, she would not get fired. But a woman who is attracted to women is gay, and she presumably would get fired. Each comparator (a straight woman attracted to men or a gay woman attracted to women) has two facts that have been changed. "The majority opinion [in *Bostock*] doesn't provide a principled reason why we should choose one comparator over the other." *Id*. As such, even assuming the statute requires but-for causation, plaintiffs would prevail here, as "sex" is not a but-for cause of a discriminatory action when the defendant is motivated by beliefs concerning sexual orientation.[16]

---

[15] Justice Alito in *Bostock* criticized the majority on this point, noting that it tried to frame sex as the only distinction between the employees because both employees are "attracted to men." *Bostock*, 590 US at ___; 140 S Ct at 1762 (Alito, J., dissenting). Justice Alito noted that the employer himself would say the objection is not to sex but sexual orientation. This might seem like a "battle of labels" (i.e., calling the employee homosexual versus saying he is attracted to men), but Justice Alito says that "[s]omething that is *not* sex discrimination cannot be converted into sex discrimination by slapping on that label." *Id*.

[16] The majority contends that the third factor is duplicative of the first two factors, as "sexual orientation in this context is simply a helpful shorthand for the combination of sex and sex preference . . . ." The framing matters, however. As discussed, the ELCRA focuses on the defendant's discriminatory intent. From this perspective, *the critical factor is sexual orientation*—which plaintiffs claim motivated their decision in this case. To the extent any factor could drop out as duplicative, it would be the "attracted to men" factor. In that case, the employee would be (a) a man, and (2) homosexual. The comparator would be (a) a woman, and (2) homosexual. Both would be fired and thus the difference in sex

Consider another oddity in the majority's analysis, one that does not even require adding a fact to the but-for test: it fails for bisexuals. Put a fired bisexual employee into the framework above: Employee A is (1) a man, and (2) attracted to both men and women. The employer has a policy against bisexuals. Employee A is fired. The comparator is: Employee B is (1) a woman, and (2) attracted to both men and women. Employee B would also be fired. See *Not the Standard*, 108 Va L Rev Online at 11-12. Therefore, sex is not a but-for cause in these circumstances. The majority's test is thus underinclusive to the extent it attempts to prove that discrimination on the basis of sexual orientation necessarily involves discrimination on the basis of sex.

If the test does not cover all of what the majority promises, it nonetheless portends to cover a great deal else. Suppose an employer asks about an applicant's race in the application paperwork. The applicant lies, thinking it will give him an advantage. He gets hired and, after some time, admits to the lie. A manager learns of this and fires the employee. "[I]t's intuitively clear that if the employer fires the employee for lying on the hiring paperwork about their race, that isn't and shouldn't be actionable discrimination under Title VII as race discrimination. But that is precisely the conclusion we might draw" from the majority's test. *Id*. at 21. A but-for analysis would proceed as follows: the employee (1) is white, and (2) said he was black on his paperwork. He gets fired for saying he was black. The comparator (1) is black, and (2) said he was black on his paperwork. He does not get fired. *Id*. Thus, race is a but-for cause and the firing is actionable. This cannot possibly be the law.

---

would not be a but-for cause. The majority does not explain why its second factor—attraction to men—should be chosen over the "sexual orientation" factor.

Consequently, even if some version of the but-for test is the right interpretation of the ELCRA, the majority applies it the wrong way. Plaintiffs' conduct does not satisfy the but-for test.

## III. CONCLUSION

The effect of the majority's decision, as Justice ZAHRA explains, is to expand the ELCRA by judicial fiat to cover discrimination "because of" sexual orientation. To do so, the majority has twisted the meaning of the statute by adopting the logic of the but-for test without the need for the defendant to have any discriminatory intent. This does not reflect the ordinary meaning of the statute or the nature of discrimination. Unintentional discrimination would seem to be an oxymoron, but the majority today endorses it. As a result, the majority has misapplied its own test.[17]

---

[17] Strangely, in an opinion that adopts the but-for test as controlling for purposes of the ELCRA, the majority claims that "the issue before this Court also does not encompass what the [Michigan Department of Civil Rights (MDCR)] must prove to demonstrate that discrimination on the basis of a protected characteristic was the cause of a denial of a public accommodation . . . ." *Ante* at 7 n 5. Elsewhere in the opinion, however, the majority explains that "the operative phrase 'because of' in the ELCRA establishes a but-for causation standard" and that "[a]ccordingly, we must answer here whether complainants who were denied service because of their sexual orientation would not have been so denied but for their sex." *Ante* at 17. See also *ante* at 18 ("Using this more restrictive definition of the term 'sex' and *applying the but-for causation standard to the provision at hand*, we conclude that discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of the ELCRA.") (emphasis added). No doubt what the majority means to say is that they are not determining whether the particular plaintiff business owners here violated the ELCRA. That may be true, but it is a superficial point based purely on the procedural posture of this case—plaintiffs have brought the action to stop the MDCR's investigation of alleged violations of the ELCRA. On the substance, the majority has clearly decided that if plaintiffs discriminated because of sexual orientation, then they have discriminated because of sex. If this does not demonstrate what must be proved to sustain a claim under the ELCRA, then I am at a complete loss to understand what the majority opinion is about.

The results will be significant for Michigan, as the scope of the ELCRA extends far beyond the statute at issue in *Bostock*. The ELCRA, for example, covers all employers, whereas Title VII applies to employers with 15 or more employees.[18] Title VII also contains exemptions for religious organizations, see 42 USC 2000e-1(a), 2000e-2(e); and other federal statutes offer protections for religious liberty that supersede Title VII's requirements, see *Bostock*, 590 US at ___; 140 S Ct at 1754 (discussing the Religious Freedom Restoration Act of 1993, 42 USC 2000bb *et seq*.). It does not appear that there are any such statutory provisions applicable to the ELCRA. In this regard, too, the majority has reached its interpretation today without any concern for whether that interpretation violates constitutional protections of religious liberty. This departs from the normal principle that courts will first consider whether an interpretation raises grave constitutional doubts before adopting that interpretation. See *Sole v Mich Economic Dev Corp*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 161598); slip op at 11. Various amici have

The majority indicates that it is instead focused on the "first step in any discrimination analysis under the ELCRA," *ante* at 23 n 17, which requires the plaintiff to establish, among other things, "discrimination based on a protected characteristic" that "result[s] in the denial of the full and equal enjoyment of the goods, services, privileges, advantages, or accommodations . . . of a place of public accommodation," *Haynes v Neshewat*, 477 Mich 29, 35; 729 NW2d 488 (2007). It is unclear what the majority means by the "first step" in the analysis. Since the majority has used the but-for causation test to smuggle sexual orientation into the statute, it is hard to understand the point of the majority opinion if it is not to allow discrimination claims to proceed based on this novel theory. But alas, I will accept the majority opinion at its word that it gives no guidance on what must be proved to establish an ELCRA claim.

[18] Compare MCL 37.2201(a) (" 'Employer' means a person who has 1 or more employees, and includes an agent of that person."), with 42 USC 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . .").

raised strong arguments that the majority's interpretation trenches on constitutional liberties. Those concerns should have been considered before the Court reached its interpretation here.[19]

For these reasons, I dissent.

David F. Viviano

---

[19] Plaintiffs have raised religious-liberty arguments that are pending in the Court of Claims and will likely be addressed *after* this opinion.